Amy COHEN, et al., Plaintiffs–Appellees,

v.

BROWN UNIVERSITY, et al.,
Defendants–Appellants.

No. 95–2205.

United States Court of Appeals,
First Circuit.

Heard April 1, 1996.

Decided Nov. 21, 1996.

Joan A. Lukey, Boston, MA, and Walter B. Connolly, Jr., Detroit, MI, with whom Hale and Dorr, Alison B. Marshall, Washington,

DC, Miller, Canfield, Paddock & Stone, Beverly E. Ledbetter, General Counsel, Brown University, Julius C. Michaelson, Jeffrey S. Michaelson and Michaelson & Michaelson, Providence, RI, were on brief for appellants.

Martin Michaelson, with whom Amy Folsom Kett, Washington, DC, Suzanne M. Bonnet, Hogan & Hartson L.L.P., Denver, CO, and Sheldon E. Steinbach, Washington, DC, General Counsel, American Council on Education, were on brief for American Council on Education, Association of American Universities, National Association of Independent Colleges and Universities, and National Association of State Universities and Land-Grant Colleges, amici curiae.

George A. Davidson, Carla A. Kerr, Seth D. Rothman and Hughes Hubbard & Reed, on brief for Baylor University, Boston University, Colgate University, College of the Holy Cross, Colorado State University, Fairfield University, George Washington University, John Hopkins University, Lafayette College, New York University, Saint Peter's College, Southern Methodist University, Tulane University, University of Arkansas, University of Nebraska, University of Notre Dame, and Wake Forest University, amici curiae.

Melinda Ledden Sidak, Washington, DC, and Anita K. Blair, Arlington, VA, on brief for The Independent Women's Forum, amicus curiae.

Stephen S. Ostrach, Todd S. Brilliant, New York City, and New England Legal Foundation, on brief for American Baseball Coaches Association, College Swim Coaches Association of America, National Wrestling Coaching Association and United States Water Polo, amici curiae.

Lynette Labinger, with whom Roney & Labinger, Amato A. DeLuca, DeLuca & Weizenbaum, Ltd., Raymond Marcaccio, Blish & Cavanagh, Providence, RI, Sandra L. Duggan, Sandra L. Duggan, Esq., P.C., Arthur H. Bryant, Leslie A. Brueckner, La Jolla, CA, and Trial Lawyers for Public Justice, P.C., were on brief for appellees.

Deborah L. Brake, with whom Marcia D. Greenberger, Judith C. Appelbaum and Na-

tional Women's Law Center were on brief for National Women's Law Center, American Association of University Women/AAUW Legal Advocacy Fund, American Civil Liberties Union Women's Rights Project, California Women's Law Center, Center For Women Policy Studies, Connecticut Women's Education and Legal Fund, Equal Rights Advocates, Feminist Majority Foundation, Girls Incorporated, National Association for Girls and Women in Sports, National Association for Women in Education, National Coalition for Sex Equity in Education, National Commission on Working Women, National Council of Administrative Women in Education, National Education Association, National Organization for Women Foundation, NOW Legal Defense and Education Fund, National Softball Coaches Association, Northwest Women's Law Center, Parents for Title IX, Rhode Island Affiliate American Civil Liberties Union, Women Employed, Women's Basketball Coaches Association, Women's Law Project, Women's Legal Defense Fund, Women's Sports Foundation, and YWCA of the USA, amici curiae.

Deval L. Patrick, Assistant Attorney General, Isabelle Katz Pinzler, Deputy Assistant Attorney General, Dennis J. Dimsey and Lisa W. Edwards, Attorneys, Department of Justice, on brief for the United States, amicus curiae.

Before TORRUELLA, Chief Judge, BOWNES, Senior Circuit Judge, and Stahl, Circuit Judge.

BOWNES, Senior Circuit Judge.

This is a class action lawsuit charging Brown University, its president, and its athletics director (collectively "Brown") with discrimination against women in the operation of its intercollegiate athletics program, in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688 ("Title IX"), and its implementing regulations, 34 C.F.R. §§ 106.1–106.71. The plaintiff class comprises all present, future, and potential Brown University women students who participate, seek to participate, and/or are deterred from participating in intercollegiate athletics funded by Brown.

This suit was initiated in response to the demotion in May 1991 of Brown's women's gymnastics and volleyball teams from university-funded varsity status to donor-funded varsity status. Contemporaneously, Brown demoted two men's teams, water polo and golf, from university-funded to donor-funded varsity status. As a consequence of these demotions, all four teams lost, not only their university funding, but most of the support and privileges that accompany university-funded varsity status at Brown.

Prior to the trial on the merits that gave rise to this appeal, the district court granted plaintiffs' motion for class certification and denied defendants' motion to dismiss. Subsequently, after hearing fourteen days of testimony, the district court granted plaintiffs' motion for a preliminary injunction, ordering, *inter alia*, that the women's gymnastics and volleyball teams be reinstated to university-funded varsity status, and prohibiting Brown from eliminating or reducing the status or funding of any existing women's intercollegiate varsity team until the case was resolved on the merits. *Cohen v. Brown Univ.*, 809 F.Supp. 978, 1001 (D.R.I.1992) ("*Cohen I*"). A panel of this court affirmed the district court's decision granting a preliminary injunction to the plaintiffs. *Cohen v. Brown Univ.*, 991 F.2d 888, 907 (1st Cir.1993) ("*Cohen II*"). In so doing, we upheld the district court's analysis and ruled that an institution violates Title IX if it ineffectively accommodates its students' interests and abilities in athletics under 34 C.F.R. § 106.41(c)(1) (1995), regardless of its performance with respect to other Title IX areas. *Id.* at 897.

On remand, the district court determined after a lengthy bench trial that Brown's intercollegiate athletics program violates Title IX and its supporting regulations. *Cohen v. Brown Univ.*, 879 F.Supp. 185, 214 (D.R.I. 1995) ("*Cohen III*"). The district court ordered Brown to submit within 120 days a comprehensive plan for complying with Title IX, but stayed that portion of the order pending appeal. *Id.* The district court subsequently issued a modified order, requiring Brown to submit a compliance plan within 60 days. Modified Order of May 4, 1995. This action was taken to ensure that the Order

was "final" for purposes of this court's jurisdiction, and to expedite the appeal process. *Id.* Finding that Brown's proposed compliance plan was not comprehensive and that it failed to comply with the opinion and order of *Cohen III*, the district court rejected the plan and ordered in its place specific relief consistent with Brown's stated objectives in formulating the plan. Order of August 17, 1995 at 11. The court's remedial order required Brown to elevate and maintain at university-funded varsity status the women's gymnastics, fencing, skiing, and water polo teams. *Id.* at 12. The district court's decision to fashion specific relief was made, in part, to avoid protracted litigation over the compliance plan and to expedite the appeal on the issue of liability. *Id.* at 11. The district court entered final judgment on September 1, 1995, and on September 27, 1995, denied Brown's motion for additional findings of fact and to amend the judgment. This appeal followed.

Brown claims error in certain evidentiary rulings made during the trial and in the district court's order of specific relief in place of Brown's proposed compliance plan. In addition, and as in the previous appeal, Brown challenges on constitutional and statutory grounds the test employed by the district court in determining whether Brown's intercollegiate athletics program complies with Title IX. In the first appeal, a panel of this court elucidated the applicable legal framework, upholding the substance of the district court's interpretation and application of the law in granting plaintiffs' motion for a preliminary injunction,[1] and rejecting essentially the same legal arguments Brown makes here.

Brown contends that we are free to disregard the prior panel's explication of the law in *Cohen II*. Brown's efforts to circumvent the controlling effect of *Cohen II* are unavailing, however, because, under the law of the case doctrine, we are bound in this appeal, as was the district court on remand, by the prior panel's rulings of law. While we acknowledge that the law of the case doctrine is subject to exceptions, we conclude that none applies here, and that the decision rendered by the prior panel in the first appeal is not, as Brown claims, "legally defective." Accordingly, we decline Brown's invitation to undertake plenary review of issues decided in the previous appeal and treat *Cohen II* as controlling authority, dispositive of the core issues raised here.

We find no error in the district court's factual findings or in its interpretation and application of the law in determining that Brown violated Title IX in the operation of its intercollegiate athletics program. We therefore affirm in all respects the district court's analysis and rulings on the issue of liability. We do, however, find error in the district court's award of specific relief and therefore remand the case to the district court for reconsideration of the remedy in light of this opinion.

## I.

The relevant facts, legal principles, and procedural history of this case have been set forth in exhaustive detail in the previous opinions issued in this case. Thus, we recite the facts as supportably found by the district court in the course of the bench trial on the merits in a somewhat abbreviated fashion.

As a Division I institution within the National Collegiate Athletic Association ("NCAA") with respect to all sports but football, Brown participates at the highest level of NCAA competition.[2] *Cohen III*, 879 F.Supp. at 188. Brown operates a two-tiered intercollegiate athletics program with respect to funding: although Brown provides the financial resources required to maintain its university-funded varsity teams, donor-funded varsity athletes must themselves raise the funds necessary to support their teams

---

1. The prior panel upheld the district court's rulings in all respects save one. We held that the district court erred in placing upon Brown the burden of proof under prong three of the three-part test used to determine whether an intercollegiate athletics program complies with Title IX, discussed *infra*. *Cohen II*, 991 F.2d at 903.

2. Brown's football team competes in Division I–AA, the second highest level of NCAA competition. *Cohen III*, 879 F.Supp. at 188 n. 4.

through private donations. *Id.* at 189. The district court noted that the four demoted teams were eligible for NCAA competition, provided that they were able to raise the funds necessary to maintain a sufficient level of competitiveness, and provided that they continued to comply with NCAA requirements. *Id.* at 189 n. 6. The court found, however, that it is difficult for donor-funded varsity athletes to maintain a level of competitiveness commensurate with their abilities and that these athletes operate at a competitive disadvantage in comparison to university-funded varsity athletes. *Id.* at 189. For example, the district court found that some schools are reluctant to include donor-funded teams in their varsity schedules[3] and that donor-funded teams are unable to obtain varsity-level coaching, recruits, and funds for travel, equipment, and post-season competition. *Id.* at 189–90.

Brown's decision to demote the women's volleyball and gymnastics teams and the men's water polo and golf teams from university-funded varsity status was apparently made in response to a university-wide cost-cutting directive. *Cohen I,* 809 F.Supp. at 981. The district court found that Brown saved $62,028 by demoting the women's teams and $15,795 by demoting the men's teams, but that the demotions "did not appreciably affect the athletic participation gender ratio." *Cohen III* at 187 n. 2.

Plaintiffs alleged that, at the time of the demotions, the men students at Brown already enjoyed the benefits of a disproportionately large share of both the university resources allocated to athletics and the intercollegiate participation opportunities afforded to student athletes. Thus, plaintiffs contended, what appeared to be the even-handed demotions of two men's and two women's teams, in fact, perpetuated Brown's discriminatory treatment of women in the administration of its intercollegiate athletics program.

In the course of the preliminary injunction hearing, the district court found that, in the academic year 1990–91, Brown funded 31

intercollegiate varsity teams, 16 men's teams and 15 women's teams, *Cohen I,* 809 F.Supp. at 980, and that, of the 894 undergraduate students competing on these teams, 63.3% (566) were men and 36.7% (328) were women, *id.* at 981. During the same academic year, Brown's undergraduate enrollment comprised 52.4% (2,951) men and 47.6% (2,683) women. *Id.* The district court also summarized the history of athletics at Brown, finding, *inter alia,* that, while nearly all of the men's varsity teams were established before 1927, virtually all of the women's varsity teams were created between 1971 and 1977, after Brown's merger with Pembroke College. *Id.* The only women's varsity team created after this period was winter track, in 1982. *Id.*

In the course of the trial on the merits, the district court found that, in 1993–94, there were 897 students participating in intercollegiate varsity athletics, of which 61.87% (555) were men and 38.13% (342) were women. *Cohen III,* 879 F.Supp. at 192. During the same period, Brown's undergraduate enrollment comprised 5,722 students, of which 48.86% (2,796) were men and 51.14% (2,926) were women. *Id.* The district court found that, in 1993–94, Brown's intercollegiate athletics program consisted of 32 teams, 16 men's teams and 16 women's teams. *Id.* Of the university-funded teams, 12 were men's teams and 13 were women's teams; of the donor-funded teams, three were women's teams and four were men's teams. *Id.* At the time of trial, Brown offered 479 university-funded varsity positions for men, as compared to 312 for women; and 76 donor-funded varsity positions for men, as compared to 30 for women. *Id.* at 211. In 1993–94, then, Brown's varsity program—including both university- and donor-funded sports— afforded over 200 more positions for men than for women. *Id.* at 192. Accordingly, the district court found that Brown maintained a 13.01% disparity between female participation in intercollegiate athletics and female student enrollment, *id.* at 211, and that "[a]lthough the number of varsity sports

3. Two schools declined to include Brown in future varsity schedules when women's volleyball was demoted to donor-funded status. *Cohen II,*

991 F.2d at 892 n. 2; *Cohen I,* 809 F.Supp. at 993.

offered to men and women are equal, the selection of sports offered to each gender generates far more individual positions for male athletes than for female athletes," *id.* at 189.

In computing these figures, the district court counted as participants in intercollegiate athletics for purposes of Title IX analysis those athletes who were members of varsity teams for the majority of the last complete season. *Id.* at 192. Brown argued at trial that "there is no consistent measure of actual participation rates because team size varies throughout the athletic season," and that "there is no consistent measure of actual participation rates because there are alternative definitions of 'participant' that yield very different participation totals." *Id.* Reasoning that "[w]here both the athlete and coach determine that there is a place on the team for a student, it is not for this Court to second-guess their judgment and impose its own, or anyone else's, definition of a valuable or genuine varsity experience," the district court concluded that "[e]very varsity team member is therefore a varsity 'participant.'" *Id.* (original emphasis omitted). Thus, the district court held that

> the "participation opportunities" offered by an institution are measured by counting the *actual participants* on intercollegiate teams. The number of participants in Brown's varsity athletic program accurately reflects the number of participation opportunities Brown offers because the University, through its practices "predetermines" the number of athletic positions available to each gender.

*Id.* at 202–03.

The district court found from extensive testimony that the donor-funded women's gymnastics, women's fencing and women's ski teams, as well as at least one women's club team, the water polo team, had demonstrated the interest and ability to compete at the top varsity level and would benefit from university funding.[4] *Id.* at 190.

The district court did *not* find that full and effective accommodation of the athletics interests and abilities of Brown's female students would disadvantage Brown's male students.

## II.

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C.A. § 1681(a) (West 1990). As a private institution that receives federal financial assistance, Brown is required to comply with Title IX.

Title IX also specifies that its prohibition against gender discrimination shall not "be interpreted to require any educational institution to grant preferential or disparate treatment to the members of one sex on account of an imbalance which may exist" between the total number or percentage of persons of that sex participating in any federally supported program or activity, and "the total number or percentage of persons of that sex in any community, State, section, or other area." 20 U.S.C.A. § 1681(b) (West 1990). Subsection (b) also provides, however, that it "shall not be construed to prevent the consideration in any ... proceeding under this chapter of statistical evidence tending to show that such an imbalance exists with respect to the participation in, or receipt of the benefits of, any such program or activity by the members of one sex." *Id.*

Applying § 1681(b), the prior panel held that Title IX "does not mandate strict numerical equality between the gender balance of a college's athletic program and the gender balance of its student body." *Cohen II,* 991 F.2d at 894. The panel explained that, while evidence of a gender-based disparity in an institution's athletics program is relevant to a determination of noncompliance, "a court assessing Title IX compliance may not find a violation *solely* because there is a disparity

---

**4.** The district court noted that "there may be other women's club sports with sufficient interest and ability to warrant elevation to varsity status," but that plaintiffs did not introduce at trial substantial evidence demonstrating the existence of other women's club teams meeting the criteria. *Cohen III,* 879 F.Supp. at 190 n. 14.

between the gender composition of an educational institution's student constituency, on the one hand, and its athletic programs, on the other hand." *Id.* at 895.

Congress enacted Title IX in response to its finding—after extensive hearings held in 1970 by the House Special Subcommittee on Education—of pervasive discrimination against women with respect to educational opportunities. 118 Cong.Rec. 5804 (1972) (remarks of Sen. Bayh); *North Haven Bd. of Educ. v. Bell,* 456 U.S. 512, 523 n. 13, 102 S.Ct. 1912, 1919 n. 13, 72 L.Ed.2d 299 (1982).

Title IX was passed with two objectives in mind: "to avoid the use of federal resources to support discriminatory practices," and "to provide individual citizens effective protection against those practices." *Cannon v. University of Chicago,* 441 U.S. 677, 704, 99 S.Ct. 1946, 1961, 60 L.Ed.2d 560 (1979). To accomplish these objectives, Congress directed all agencies extending financial assistance to educational institutions to develop procedures for terminating financial assistance to institutions that violate Title IX. 20 U.S.C. § 1682.

The agency responsible for administering Title IX is the United States Department of Education ("DED"), through its Office for Civil Rights ("OCR").[5] Congress expressly delegated to DED the authority to promulgate regulations for determining whether an athletics program complies with Title IX. Pub.L. No. 93–380, 88 Stat. 612 (1974).[6] The regulations specifically address athletics at 34 C.F.R. §§ 106.37(c) and 106.41. The regulation at issue in this case, 34 C.F.R. § 106.41 (1995), provides:

(a) *General.* No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.

(b) *Separate teams.* Notwithstanding the requirements of paragraph (a) of this section, a recipient may operate or sponsor separate teams for members of each sex where selection of such teams is based upon competitive skill or the activity involved is a contact sport. However, where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport. For the purposes of this part, contact sports include boxing, wrestling, rugby, ice hockey, football, basketball and other sports the purpose or major activity of which involves bodily contact.

(c) *Equal Opportunity.* A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes. In determining whether equal opportunities are available the Director will consider, among other factors:

(1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;

(2) The provision of equipment and supplies;

---

**5.** Agency responsibility for administration of Title IX shifted from the Department of Health, Education and Welfare ("HEW") to DED when HEW split into two agencies, DED and the Department of Health and Human Services. The regulations and agency documents discussed herein were originally promulgated by HEW, the administering agency at the time, and later adopted by the present administering agency, DED. *See Cohen II,* 991 F.2d at 895; *Cohen III,* 879 F.Supp. at 194–95 n. 23. For simplicity, we treat DED as the promulgating agency.

**6.** HEW apparently received an unprecedented 9,700 comments on the proposed Title IX athletics regulations, *see Haffer v. Temple Univ. of the Commonwealth Sys. of Higher Educ.,* 524 F.Supp. 531, 536 n. 9 (1981) (citing Thomas A. Cox, *Intercollegiate Athletics and Title IX,* 46 Geo. Wash.L.Rev. 34, 40 (1977) ("Cox")), prompting former HEW Secretary Caspar Weinberger to remark, "I had not realized until the comment period that athletics is the single most important thing in the United States," *id.* (citing Cox at 34, quoting N.Y.Times, June 27, 1975, at 16, col. 4).

(3) Scheduling of games and practice time;

(4) Travel and per diem allowance;

(5) Opportunity to receive coaching and academic tutoring;

(6) Assignment and compensation for coaches and tutors;

(7) Provision of locker rooms, practice and competitive facilities;

(8) Provision of medical and training facilities and services;

(9) Provision of housing and dining facilities and services;

(10) Publicity.

In the first appeal, this court held that an institution's failure effectively to accommodate both genders under § 106.41(c)(1) is sufficient to establish a violation of Title IX. *Cohen II*, 991 F.2d at 897.

In 1978, several years after the promulgation of the regulations, OCR published a proposed "Policy Interpretation," the purpose of which was to clarify the obligations of federal aid recipients under Title IX to provide equal opportunities in athletics programs. "In particular, this Policy Interpretation provides a means to assess an institution's compliance with the equal opportunity requirements of the regulation which are set forth at [34 C.F.R. §§ 106.37(c) and 106.41(c)]." 44 Fed.Reg. at 71,415. After considering a large number of public comments, OCR published the final Policy Interpretation. 44 Fed.Reg. 71,413–71,423 (1979). While the Policy Interpretation covers other areas, this litigation focuses on the "Effective Accommodation" section, which interprets 34 C.F.R. § 106.41(c)(1), the first of the nonexhaustive list of ten factors to be considered in determining whether equal athletics opportunities are available to both genders. The Policy Interpretation establishes a three-part test, a two-part test, and factors to be considered in determining compliance under 34 C.F.R. § 106.41(c)(1). At issue in this appeal is the proper interpretation of the first of these, the so-called three-part test,[7] which inquires as follows:

(1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

(2) Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

(3) Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

44 Fed.Reg. at 71,418.

The district court held that, "because Brown maintains a 13.01% disparity between female participation in intercollegiate athletics and female student enrollment, it cannot gain the protection of prong one." *Cohen III*, 879 F.Supp. at 211. Nor did Brown satisfy prong two. While acknowledging that Brown "has an impressive *history* of program expansion," the district court found that Brown failed to demonstrate that it has "maintained a *continuing practice* of intercollegiate program expansion for women, the underrepresented sex." *Id.* The court noted further that, because merely reducing program offerings to the overrepresented gender does not constitute program expansion for the underrepresented gender, the fact that Brown has eliminated or demoted several men's teams does not amount to a continuing practice of program expansion for women. *Id.* As to prong three, the district court found that Brown had not "*fully* and effectively accommodated the interest and ability of the underrepresented sex 'to the extent necessary to provide equal opportunity in the selection of sports and levels of competition available to members of both

---

7. For clarification, we note that the cases refer to each part of this three-part test as a "prong" or a "benchmark." Prong one is also called the "substantial proportionality test."

sexes.' " *Id.* (quoting the Policy Interpretation, 44 Fed.Reg. at 71,417).

On January 16, 1996, DED released a "Clarification Memorandum," which does not change the existing standards for compliance, but which does provide further information and guidelines for assessing compliance under the three-part test. The Clarification Memorandum contains many examples illustrating how institutions may meet each prong of the three-part test and explains how participation opportunities are to be counted under Title IX.

The district court found that Brown predetermines the approximate number of varsity positions available to men and women, and, thus, that "the concept of any measure of unfilled but available athletic slots does not comport with reality." *Cohen III,* 879 F.Supp. at 203 n. 36. The district court concluded that intercollegiate athletics opportunities "means real opportunities, not illusory ones, and therefore should be measured by counting *actual participants.*" *Id.* at 204 (internal quotation marks and citations omitted).

Title IX is an anti-discrimination statute, modeled after Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d ("Title VI").[8] *See Cannon,* 441 U.S. at 696, 99 S.Ct. at 1957 ("The drafters of Title IX explicitly assumed that it would be interpreted and applied as Title VI had been during the preceding eight years."). Thus, Title IX and Title VI share the same constitutional underpinnings. *See* Jeffrey H. Orleans, *An End To The Odyssey: Equal Athletic Opportunities For Women,* 3 Duke J.Gender L. & Pol'y 131, 133–34 (1996).

Although the statute itself provides for no remedies beyond the termination of federal funding, the Supreme Court has determined that Title IX is enforceable through an implied private right of action, *Cannon,* 441 U.S. at 703, 99 S.Ct. at 1961, and that damages are available for an action brought under Title IX, *Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60, 76, 112 S.Ct. 1028, 1038, 117 L.Ed.2d 208 (1992). The right to injunctive relief under Title IX appears to

have been impliedly accepted by the Supreme Court in *Franklin. Id.* at 64–66, 71–73, 112 S.Ct. at 1031–33, 1035–37. In addition, a majority of the Court in *Guardians Ass'n v. Civil Serv. Comm'n,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983), agreed that injunctive relief and other equitable remedies are appropriate for violations of Title VI.

According to the statute's senate sponsor, Title IX was intended to

> provide for the women of America something that is rightfully theirs—an equal chance to attend the schools of their choice, to develop the skills they want, and to apply those skills with the knowledge that they will have a fair chance to secure the jobs of their choice with equal pay for equal work.

118 Cong.Rec. 5808 (1972) (remarks of Sen. Bayh) (*quoted in Haffer,* 524 F.Supp. at 541).

### III.

■ In *Cohen II,* a panel of this court squarely rejected Brown's constitutional and statutory challenges to the Policy Interpretation's three-part test, upholding the district court's interpretation of the Title IX framework applicable to intercollegiate athletics, *Cohen II,* 991 F.2d at 899–902, as well as its grant of a preliminary injunction in favor of the plaintiffs, *id.* at 906–07. Despite the fact that it presents substantially the same legal arguments in this appeal as were raised and decided in the prior appeal, Brown asserts that there is "no impediment" to this court's plenary review of these decided issues. We disagree.

■ The law of the case doctrine precludes relitigation of the legal issues presented in successive stages of a single case once those issues have been decided. *See* 1B James W. Moore et al., Moore's Federal Practice ¶ 0.404[1] (2d ed. 1993) (hereinafter "Moore"). "The doctrine of the law of the case directs that a decision of an appellate court on an issue of law, unless vacated or set aside, governs the issue during all subse-

---

8. Title VI prohibits discrimination on the basis of race, color, or national origin in institutions ben-

efitting from federal funds.

quent stages of litigation in the *nisi prius* court and thereafter on any further appeal." *Commercial Union Ins. Co. v. Walbrook Ins. Co.,* 41 F.3d 764, 769 (1st. Cir.1994) (citing *United States v. Rivera–Martinez,* 931 F.2d 148 (1st Cir.), *cert. denied,* 502 U.S. 862, 112 S.Ct. 184, 116 L.Ed.2d 145 (1991)). The reviewing court's mandate "constitutes the law of the case on such issues of law as were actually considered and decided by the appellate court, or as were necessarily inferred from the disposition on appeal." *Commercial Union Ins. Co.,* 41 F.3d at 770 (citing 1B Moore at ¶ 0.404[10] ). The doctrine requires a trial court on remand to dispose of the case in accordance with the appellate court's mandate by implementing " 'both the letter and the spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces,' " *United States v. Connell,* 6 F.3d 27, 30 (1st Cir.1993) (quoting *United States v. Kikumura,* 947 F.2d 72, 76 (3d Cir.1991)), and binds newly constituted panels to prior panel decisions on point, *e.g., Irving v. United States,* 49 F.3d 830, 833–34 (1st Cir.1995); *Metcalf & Eddy, Inc. v. Puerto Rico Aqueduct and Sewer Auth.,* 991 F.2d 935, 939 n. 3 (1st Cir.1993).

■ While we have acknowledged that there are exceptions to the law of the case doctrine, we have emphasized that the circumstances in which they apply are rare. As have a number of other circuits, we have determined that issues decided on appeal should not be reopened " 'unless the evidence on a subsequent trial was substantially different, controlling authority has since made a contrary decision of law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice.' " *Rivera–Martinez,* 931 F.2d at 151 (quoting *White v. Murtha,* 377 F.2d 428, 432 (5th Cir.1967)) (other citations omitted).

Brown's argument that the Supreme Court's recent decision in *Adarand Constr., Inc. v. Pena,* — U.S. —, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (*"Adarand "*), controls this case necessarily presumes that *Adarand* constitutes a contrary intervening decision by controlling authority on point that (i) undermines the validity of *Cohen II;* (ii) compels us to depart from the law of the case doctrine; and (iii) therefore mandates that we reexamine Brown's equal protection claim.

We have narrowly confined the "intervening controlling authority exception" to Supreme Court opinions, *en banc* opinions of this court, or statutory overrulings. *Irving,* 49 F.3d at 834. We have also recognized that this exception may apply "in those rare situations where newly emergent authority, although not directly controlling, nevertheless offers a convincing reason for believing that the earlier panel, in light of the neoteric developments, would change its course." *Id.* (internal quotation marks and citation omitted).

■ The law of the case doctrine is a prudential rule of policy and practice, rather than "an absolute bar to reconsideration [ ] or a limitation on a federal court's power." *Rivera–Martinez,* 931 F.2d at 150–51. Thus, we have not construed the doctrine as "an inflexible straitjacket that invariably requires rigid compliance." *Northeast Utils. Serv. Co. v. Federal Energy Regulatory Comm'n,* 55 F.3d 686, 688 (1st Cir.1995). Nevertheless, the doctrine serves important goals and must be "treated respectfully and, in the absence of exceptional circumstances, applied according to its tenor." *Rivera–Martinez,* 931 F.2d at 151. Accordingly, we have held that only a few exceptional circumstances can overcome the interests served by adherence to the doctrine and these exceptions are narrowly circumscribed. *See id.; see also United States v. Reveron Martinez,* 836 F.2d 684, 687 n. 2 (1st Cir.1988) ("To be sure, there may be occasions when courts can—and should—loosen the iron grip of *stare decisis.* But any such departure 'demands special justification.' ") (quoting *Arizona v. Rumsey,* 467 U.S. 203, 212, 104 S.Ct. 2305, 2310–11, 81 L.Ed.2d 164 (1984)).[9]

---

9. The law of the case doctrine is "akin to the doctrines of *collateral estoppel, res judicata,* and *stare decisis,*" Joan Steinman, *Law Of The Case: A Judicial Puzzle In Consolidated And Transferred Cases And In MultiDistrict Litigation,* 135

U.Penn.L.Rev. 595, 598–99 (1987) (footnotes omitted), and "has been said to lie half way between *stare decisis* and *res judicata,*" 1B Moore at ¶ 0.404[1] n. 3 (internal quotation marks and citation omitted). As applied in the federal

For the reasons that follow, we conclude that no exception to the law of the case doctrine applies here and, therefore, that *Cohen II*'s rulings of law control the disposition of this appeal.

Brown contends that *stare decisis* does not bind this panel "to the previous preliminary ruling of this Court because it lacks the element of finality," Reply Br. at 24, and that the law of the case doctrine does not prevent a court from "changing its mind," *id.* at n. 47.

■ We acknowledge that we have repeatedly emphasized that conclusions and holdings regarding the merits of issues presented on appeal from a grant of a preliminary injunction are to be understood as statements as to probable outcomes. *E.g., A.M. Capen's Co. v. American Trading and Prod. Corp.,* 74 F.3d 317, 322 (1st Cir.1996); *Narragansett Indian Tribe v. Guilbert,* 934 F.2d 4, 6 (1st Cir.1991). The concern informing this caveat arises when we are asked to rule on the propriety of a district court's grant of a preliminary injunction (or otherwise issue a preliminary ruling) without benefit of full argument and a well-developed record. In this case, however, the record before the prior panel was "sufficiently developed and the facts necessary to shape the proper legal matrix [we]re sufficiently clear," *Cohen II,* 991 F.2d at 904, and nothing in the record subsequently developed at trial constitutes substantially different evidence that might undermine the validity of the prior panel's rulings of law. In considering plaintiffs' motion for a preliminary injunction in *Cohen I,* the district court (i) "paid meticulous attention to the parties' prospects for success over the long haul;" (ii) "plainly visualized both the factual intricacies and legal complexities that characterize Title IX litigation;" (iii) "held a lengthy adversary hearing and reviewed voluminous written submissions;" and (iv) "correctly focused on the three-part accommodation test." *Cohen II,* 991 F.2d at 903. Further, as the district court noted in its opinion after the trial on the merits, "[n]othing in the record before

me, now fully developed, undermines the considered legal framework established by the First Circuit at the preliminary injunction stage." *Cohen III,* 879 F.Supp. at 194.

Brown offers remarkably little in the way of analysis or authority to support its blithe contention that we are free to disregard *Cohen II* in disposing of this appeal. Indeed, Brown argues as if the prior panel had not decided the precise statutory interpretation questions presented (which it clearly did) and as if the district court's liability analysis were contrary to the law enunciated in *Cohen II* (which it clearly is not). Finding Brown's bare assertions to be unpersuasive, we decline the invitation to this court to "change its mind." The precedent established by the prior panel is not clearly erroneous; it is the law of this case and the law of this circuit.

## IV.

Brown contends that the district court misconstrued and misapplied the three-part test. Specifically, Brown argues that the district court's interpretation and application of the test is irreconcilable with the statute, the regulation, and the agency's interpretation of the law, and effectively renders Title IX an "affirmative action statute" that mandates preferential treatment for women by imposing quotas in excess of women's relative interests and abilities in athletics. Brown asserts, in the alternative, that if the district court properly construed the test, then the test itself violates Title IX and the United States Constitution.

We emphasize two points at the outset. First, notwithstanding Brown's persistent invocation of the inflammatory terms "affirmative action," "preference," and "quota," this is not an affirmative action case. Second, Brown's efforts to evade the controlling authority of *Cohen II* by recasting its core legal arguments as challenges to the "district court's interpretation" of the law are unavailing; the primary arguments raised here have

courts today, the law of the case doctrine more closely resembles the doctrine of *stare decisis*. 1B Moore at ¶ 0.404[1]. Both doctrines reflect concerns that have long been recognized as fundamentally important to the rule of law—e.g.,

stability, predictability, and respect for judicial authority—and both doctrines are applied "with more or less rigidity depending on which interest is served." *Id.* at II–2.

already been litigated and decided adversely to Brown in the prior appeal.

## A.

■ Brown's talismanic incantation of "affirmative action" has no legal application to this case and is not helpful to Brown's cause. While "affirmative action" may have different connotations as a matter of politics, as a matter of law, its meaning is more circumscribed. True affirmative action cases have historically involved a voluntary [10] undertaking to remedy discrimination (as in a program implemented by a governmental body, or by a private employer or institution), by means of specific group-based preferences or numerical goals, and a specific timetable for achieving those goals. *See Adarand,* —— U.S. ——, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (remanding for review under strict scrutiny a challenge to a federal statute establishing a government-wide goal for awarding to minority businesses not less than 5% of the total value of all prime contracts and subcontracts for each fiscal year); *Metro Broadcasting v. FCC,* 497 U.S. 547, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990) (upholding a federal program requiring race-based preferences); *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (striking down a municipal set-aside program requiring that 30% of the city's construction dollars be paid to racial minority subcontractors on an annual basis); *Johnson v. Transportation Agency,* 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1986) (upholding a temporary program authorizing a county agency to consider sex and race as factors in making promotions in order to achieve a statistically measurable improvement in the representation of women and minorities in major job classifications in which they had been historically underrepresented); *Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986) (striking down a collective-bargaining faculty lay-off provision requiring preferential treatment for certain racial minorities); *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) (upholding a federal program requiring state and local recipients of federal public works grants to set aside 10% of funds for procuring goods and services from minority business enterprises); *United Steelworkers v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979) (upholding a collective bargaining agreement that set aside for blacks half the places in a new training program until the percentage of blacks among skilled workers at the plant was commensurate with the percentage of blacks in the local labor force); *Regents of the Univ. of Cal. v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (striking down a state medical school's admissions policy that set aside 16 of its places for racial minorities).

Title IX is not an affirmative action statute; it is an anti-discrimination statute, modeled explicitly after another anti-discrimination statute, Title VI. No aspect of the Title IX regime at issue in this case—inclusive of the statute, the relevant regulation, and the pertinent agency documents—mandates gender-based preferences or quotas, or specific timetables for implementing numerical goals.

Like other anti-discrimination statutory schemes, the Title IX regime *permits* affirmative action.[11] In addition, Title IX, like

---

**10.** Cases and commentators sometimes treat cases involving involuntarily implemented plans—e.g., plans adopted pursuant to a consent decree or a contempt order—as affirmative action cases. *See, e.g., United States v. Paradise,* 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987) (upholding a "one-black-for-one-white" promotion requirement ordered by a district court as an interim measure in response to proven discrimination by a state employer); *Local 28 of Sheet Metal Workers v. EEOC,* 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986) (upholding a federal district court's imposition on the union a goal for racial minority membership as a remedy for the union's contempt of the court's

earlier orders to cease racially discriminatory admissions practices).

**11.** As previously noted, Title IX itself specifies only that the statute shall not be interpreted to *require* gender-based preferential or disparate treatment. 20 U.S.C. § 1681(b). However, although Congress could easily have done so, it did not ban affirmative action or gender-conscious remedies under Title IX. *See also Weber,* 443 U.S. at 201–02, 99 S.Ct. at 2726–27 (construing the prohibition against race discrimination contained in §§ 703(a) and (d) of Title VII, and concluding that "an interpretation of the sections that forbade all race-conscious affirmative action

other anti-discrimination schemes, permits an inference that a significant gender-based statistical disparity may indicate the existence of discrimination. Consistent with the school desegregation cases, the question of substantial proportionality under the Policy Interpretation's three-part test is merely the starting point for analysis, rather than the conclusion; a rebuttable presumption, rather than an inflexible requirement. *See, e.g., Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 25, 91 S.Ct. 1267, 1280, 28 L.Ed.2d 554 (1971). In short, the substantial proportionality test is but one aspect of the inquiry into whether an institution's athletics program complies with Title IX.

Also consistent with the school desegregation cases, the substantial proportionality test of prong one is applied under the Title IX framework, not mechanically, but case-by-case, in a fact-specific manner. As with other anti-discrimination regimes, Title IX neither mandates a finding of discrimination based solely upon a gender-based statistical disparity, *see Cohen II*, 991 F.2d at 895, nor prohibits gender-conscious remedial measures. *See Missouri v. Jenkins,* —— U.S. ——, ——, 115 S.Ct. 2038, 2048, 132 L.Ed.2d 63 (1995) (acknowledging the constitutional permissibility of court-ordered, race-conscious remedial plans designed to restore victims of discrimination to the positions they would have occupied in the absence of such conduct); *Fullilove*, 448 U.S. at 483, 100 S.Ct. at 2777 (recognizing that the authority of a federal court to incorporate racial criteria into a remedial decree also extends to statutory violations and that, where federal anti-discrimination laws have been violated, race-conscious remedies may be appropriate); *Weber*, 443 U.S. at 197, 99 S.Ct. at 2724 (holding that Title VII does not prohibit private employers from voluntarily implementing race-conscious measures to eliminate "manifest racial imbalances in traditionally segregated job categories"); *McDaniel v.*

*Barresi*, 402 U.S. 39, 41, 91 S.Ct. 1287, 1288–89, 28 L.Ed.2d 582 (1971) (recognizing that measures required to remedy race discrimination "will almost invariably require" race-conscious classifications, and that "[a]ny other approach would freeze the status quo that is the very target of all desegregation processes").

■ Another important distinction between this case and affirmative action cases is that the district court's remedy requiring Brown to accommodate fully and effectively the athletics interests and abilities of its women students does not raise the concerns underlying the Supreme Court's requirement of a particularized factual predicate to justify voluntary affirmative action plans. In reviewing equal protection challenges to such plans, the Court is concerned that government bodies are reaching out to implement race- or gender-conscious remedial measures that are "ageless in their reach into the past, and timeless in their ability to affect the future," *Wygant*, 476 U.S. at 276, 106 S.Ct. at 1848, on the basis of facts insufficient to support a prima facie case of a constitutional or statutory violation, *Croson*, 488 U.S. at 500, 109 S.Ct. at 725, to the benefit of unidentified victims of past discrimination, *see id.* at 469, 109 S.Ct. at 706; *Wygant*, 476 U.S. at 276, 106 S.Ct. at 1848. Accordingly, the Court has taken the position that voluntary affirmative action plans cannot be constitutionally justified absent a particularized factual predicate demonstrating the existence of "identified discrimination," *see Croson*, 488 U.S. at 500–06, 109 S.Ct. at 725–28, because "[s]ocietal discrimination, without more, is too amorphous a basis for imposing a racially classified remedy," *Wygant*, 476 U.S. at 276, 106 S.Ct. at 1848.

From a constitutional standpoint, the case before us is altogether different. Here, gender-conscious relief was ordered by an Article III court, constitutionally compelled to have before it litigants with standing to raise

would bring about an end completely at variance with the purpose of the statute and must be rejected") (internal quotation marks and citations omitted); *id.* at 205–06, 99 S.Ct. at 2728–29 (construing § 703(j) of Title VII, upon which § 1681(b) of Title IX was based, and concluding that "[t]he natural inference is that Congress

chose not to forbid all voluntary race-conscious affirmative action").

In addition, remedial action and voluntary affirmative action to overcome the effects of gender discrimination are permitted under the Title IX regulations, 34 C.F.R. § 106.3, and by the Policy Interpretation, 44 Fed.Reg. at 71,416.

the cause of action alleged; for the purpose of providing relief upon a duly adjudicated determination that specific defendants had discriminated against a certified class of women in violation of a federal anti-discrimination statute; based upon findings of fact that were subject to the Federal Rules of Evidence. The factual problem presented in affirmative action cases is, "Does the evidence support a finding of discrimination such that race- or gender-conscious remedial measures are appropriate?" We find these multiple indicia of reliability and specificity to be sufficient to answer that question in the affirmative.

 From the mere fact that a remedy flowing from a judicial determination of discrimination is gender-conscious, it does not follow that the remedy constitutes "affirmative action." Nor does a "reverse discrimination" claim arise every time an anti-discrimination statute is enforced. While some gender-conscious relief may adversely impact one gender—a fact that has not been demonstrated in this case—that alone would not make the relief "affirmative action" or the consequence of that relief "reverse discrimination." To the contrary, race- and gender-conscious remedies are both appropriate and constitutionally permissible under a federal anti-discrimination regime, although such remedial measures are still subject to equal protection review. *See Miller v. Johnson,* — U.S. ——, ——, 115 S.Ct. 2475, 2491, 132 L.Ed.2d 762 (1995) ("compliance with federal antidiscrimination laws cannot justify race-based districting where the challenged district was not reasonably necessary under a constitutional reading and application of those laws") (citing *Shaw v. Reno,* 509 U.S. 630, 653–54, 113 S.Ct. 2816, 2830–31, 125 L.Ed.2d 511 (1993)).

### B.

*Cohen II* squarely rejected Brown's interpretation of the three-part test and carefully delineated its own, which is now the law of this circuit as well as the law of this case. On remand, the district court's liability analysis explicitly and faithfully adhered to *Cohen II*'s mandate, and we are bound to do the same at this stage of the litigation, ab-

sent one of the exceptional circumstances discussed *supra.* Because the precise questions presented regarding the proper interpretation of the Title IX framework were considered and decided by a panel of this court in the prior appeal, and because no exception to the law of the case doctrine is presented, we have no occasion to reopen the issue here. Brown's rehashed statutory challenge is foreclosed by the law of the case doctrine and we are therefore bound by the prior panel's interpretation of the statute, the regulation, and the relevant agency pronouncements.

In its liability analysis, the district court expressly accepted *Cohen II*'s elucidation of the applicable law, *Cohen III,* 879 F.Supp. at 194, and applied the law in accordance with its mandate, *id.* at 210–13. Indeed, every circuit court to have reviewed a Title IX claim of discrimination in athletics since *Cohen II* was decided is in accord with its explication of the Title IX regime as it applies to athletics. *See Horner v. Kentucky High Sch. Athletic Ass'n,* 43 F.3d 265 (6th Cir.1994); *Kelley v. Board of Trustees,* 35 F.3d 265 (7th Cir.1994), *cert. denied,* — U.S. ——, 115 S.Ct. 938, 130 L.Ed.2d 883 (1995); *Favia v. Indiana Univ. of Pa.,* 7 F.3d 332 (3d Cir.1993); *Roberts v. Colorado State Bd. of Agric.,* 998 F.2d 824 (10th Cir.), *cert. denied,* 510 U.S. 1004, 114 S.Ct. 580, 126 L.Ed.2d 478 (1993).

*Cohen II* held that the Policy Interpretation is entitled to substantial deference because it is the enforcing agency's "considered interpretation of the regulation." 991 F.2d at 896–97. Brown argues that the district court erred in concluding that it was obligated to give substantial deference to the Policy Interpretation, on the ground that "the interpretation is not a worthy candidate for deference," Reply Br. at 15, because "the urged interpretation is illogical, conflicts with the Constitution, the Statute, the Regulation, other Agency materials and practices, existing analogous caselaw and, in addition, is bad policy," *id.* We reject Brown's kitchen-sink characterization of the Policy Interpretation and its challenge to the substantial deference accorded that document by the district court.

The Policy Interpretation represents the responsible agency's interpretation of the intercollegiate athletics provisions of Title IX and its implementing regulations. 44 Fed.Reg. at 71,413. It is well settled that, where, as here, Congress has expressly delegated to an agency the power to "elucidate a specific provision of a statute by regulation," the resulting regulations should be accorded "controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984). It is also well established "'that an agency's construction of its own regulations is entitled to substantial deference.'" *Martin v. Occupational Safety and Health Review Comm'n,* 499 U.S. 144, 150, 111 S.Ct. 1171, 1175–76, 113 L.Ed.2d 117 (1991) (quoting *Lyng v. Payne,* 476 U.S. 926, 939, 106 S.Ct. 2333, 2341–42, 90 L.Ed.2d 921 (1986)) (other citation omitted). As the Supreme Court has explained, "[b]ecause applying an agency's regulation to complex or changing circumstances calls upon the agency's unique expertise and policymaking prerogatives, we presume that the power authoritatively to interpret its own regulations is a component of the agency's delegated lawmaking powers." *Martin,* 499 U.S. at 151, 111 S.Ct. at 1176 (citation omitted).

Applying these principles, *Cohen II* held that the applicable regulation, 34 C.F.R. § 106.41, deserves controlling weight, 991 F.2d at 895; that the Policy Interpretation warrants substantial deference, *id.* at 896–97; and that, "[b]ecause the agency's rendition stands upon a plausible, if not inevitable, reading of Title IX, we are obligated to enforce the regulation according to its tenor," *id.* at 899 (citations omitted). *Accord Horner,* 43 F.3d at 274–75; *Kelley,* 35 F.3d at 270; *Favia v. Indiana Univ. of Pa.,* 812 F.Supp. 578, 584 (W.D.Pa.), *aff'd,* 7 F.3d 332 (3d Cir.1993). On remand, the district court properly applied the legal framework elucidated in *Cohen II* and explicitly followed this court's mandate in according controlling weight to the regulation and substantial deference to the Policy Interpretation. *Cohen III,* 879 F.Supp. at 197–99; *accord Kelley,* 35 F.3d at 272 (holding that "neither the regulation nor the policy interpretation run afoul of the dictates of Title IX"). We hold that the district court did not err in the degree of deference it accorded the regulation and the relevant agency pronouncements.

### C.

As previously noted, the district court held that, for purposes of the three-part test, the intercollegiate athletics participation opportunities offered by an institution are properly measured by counting the number of actual participants on intercollegiate teams. *Cohen III,* 879 F.Supp. at 202. The Policy Interpretation was designed specifically for intercollegiate athletics.[12] 44 Fed.Reg. at 71,413. Because the athletics regulation distinguishes between club sports and intercollegiate sports, under the Policy Interpretation, "club teams will not be considered to be intercollegiate teams except in those instances where they regularly participate in varsity competition." *Id.* at n. 1. Accordingly, the district court excluded club varsity teams from the definition of "intercollegiate teams" and, therefore, from the calculation of participation opportunities, because the evidence was inadequate to show that the club teams regularly participated in varsity competition. *Cohen III,* 879 F.Supp. at 200.

The district court's definition of athletics participation opportunities comports with the agency's own definition. *See* Clarification Memorandum at 2 ("In determining participation opportunities, OCR counts the number of actual athletes participating in the athletic program."). We find no error in the district court's definition and calculation of the intercollegiate athletics participation opportunities afforded to Brown students, and no error in the court's finding of a 13.01% disparity between the percentage of women participating in intercollegiate varsity athlet-

---

**12.** Application of the Policy Interpretation is not limited to intercollegiate athletics, however. The Policy Interpretation states that "its general principles will often apply to club, intramural, and interscholastic athletic programs, which are also covered by the regulation." 44 Fed.Reg. at 71,413.

ics at Brown and the percentage of women in Brown's undergraduate student body.

### D.

Brown contends that an athletics program equally accommodates both genders and complies with Title IX if it accommodates the *relative* interests and abilities of its male and female students. This "relative interests" approach posits that an institution satisfies prong three of the three-part test by meeting the interests and abilities of the underrepresented gender only to the extent that it meets the interests and abilities of the overrepresented gender.[13] *See Cohen II,* 991 F.2d at 899.

Brown maintains that the district court's decision imposes upon universities the obligation to engage in preferential treatment for women by requiring quotas in excess of women's relative interests and abilities. With respect to prong three, Brown asserts that the district court's interpretation of the word "fully" "requires universities to favor women's teams and treat them better than men's [teams] .... forces them to eliminate or cap men's teams .... [and] forces universities to impose athletic quotas in excess of relative interests and abilities." Appellant's Br. at 55.

The prior panel considered and rejected Brown's approach, observing that "Brown reads the 'full' out of the duty to accommodate 'fully and effectively.'" *Cohen II,* 991 F.2d at 899. Under *Cohen II*'s controlling interpretation, prong three "demands not merely some accommodation, but full and effective accommodation. If there is sufficient interest and ability among members of the statistically underrepresented gender, not slaked by existing programs, an institution necessarily fails this prong of the test." *Id.* at 898.

Brown's interpretation of full and effective accommodation is "simply not the law." *Cohen III,* 879 F.Supp. at 208. We agree with the prior panel and the district court that Brown's relative interests approach "cannot withstand scrutiny on either legal or policy grounds," *Cohen II,* 991 F.2d at 900, because it "disadvantages women and undermines the remedial purposes of Title IX by limiting required program expansion for the underrepresented sex to the status quo level of relative interests," *Cohen III,* 879 F.Supp. at 209. After *Cohen II,* it cannot be maintained that the relative interests approach is compatible with Title IX's equal accommodation principle as it has been interpreted by this circuit.

■ Brown argues that the district court's interpretation of the three-part test *requires* numerical proportionality, thus imposing a gender-based quota scheme in contravention of the statute. This argument rests, in part, upon Brown's reading of 20 U.S.C. § 1681(b) as a categorical proscription against consideration of gender parity. Section 1681(b) provides:

> Nothing contained in subsection (a) of this section shall be interpreted to require any educational institution to grant preferential or disparate treatment to the members of one sex on account of an imbalance which may exist with respect to the total number or percentage of persons of that sex participating in or receiving the benefits of any federally supported program or activity, in comparison with the total number or percentage of persons of that sex *in any community, State, section or other area....*

20 U.S.C.A. § 1681(b) (West 1990) (emphasis added).

The prior panel, like Brown, assumed without analysis that § 1681(b) applies unequivocally to intercollegiate athletics programs. We do not question *Cohen II*'s application of § 1681(b). We think it important to bear in mind, however, the congressional concerns that inform the proper interpretation of this provision. Section 1681(b) was patterned af-

---

**13.** We note that Brown presses its relative interests argument under both prong one and prong three. At trial, Brown argued that, "in order to succeed on prong one, plaintiffs bear the burden of proving that the percentage of women among varsity athletes is not substantially proportionate to the percentage of women among *students interested in participating in varsity athletics.*" *Cohen III,* 879 F.Supp. at 205. At the preliminary injunction stage, Brown propounded the same relative interests argument under prong three. *Id.* at n. 41.

ter § 703(j) of Title VII, 42 U.S.C. § 2000e–2(j), and was specifically designed to prohibit quotas in university admissions and hiring, based upon the percentage of individuals of one gender in a geographical community. *See* H.R.Rep. No. 554, 92d Cong., 1st Sess. (1971), *reprinted in* 1972 U.S.C.C.A.N. 2462, 2590–92 (Additional Views); 117 Cong.Rec. 39,261–62 (1971) (remarks of Rep. Quie); 117 Cong.Rec. 30,406, 30,409 (remarks of Sen. Bayh); 117 Cong.Rec. 39,251–52 (remarks of Rep. Mink and Rep. Green). Thus, the legislative history strongly suggests that the underscored language defines what is proscribed (in the contexts of admissions and hiring) in terms of a geographical area, *beyond the institution*, and does not refer to an imbalance *within the university*, with respect to the representation of each gender in intercollegiate athletics, as compared to the gender makeup of the student body.

In any event, the three-part test is, on its face, entirely consistent with § 1681(b) because the test does not *require* preferential or disparate treatment for either gender. Neither the Policy Interpretation's three-part test, nor the district court's interpretation of it, *mandates* statistical balancing; "[r]ather, the policy interpretation merely creates a presumption that a school is in compliance with Title IX and the applicable regulation when it achieves such a statistical balance." *Kelley*, 35 F.3d at 271.

 The test is also entirely consistent with § 1681(b) as applied by the prior panel and by the district court. As previously noted, *Cohen II* expressly held that "a court assessing Title IX compliance may not find a violation *solely* because there is a disparity between the gender composition of an educational institution's student constituency, on the one hand, and its athletic programs, on the other hand." 991 F.2d at 895. The panel then carefully delineated the burden of proof, which requires a Title IX plaintiff to show, not only "disparity between the gender composition of the institution's student body and its athletic program, thereby proving that there is an underrepresented gender," *id.* at 901, but also "that a second element—unmet interest—is present," *id.*, meaning that the underrepresented gender

has not been fully and effectively accommodated by the institution's present athletic program, *id.* at 902 (citing 44 Fed.Reg. at 71,418). Only where the plaintiff meets the burden of proof on these elements *and* the institution fails to show as an affirmative defense a history and continuing practice of program expansion responsive to the interests and abilities of the underrepresented gender will liability be established. Surely this is a far cry from a one-step imposition of a gender-based quota.

Brown simply ignores the fact that it is required to accommodate fully the interests and abilities of the underrepresented gender, not because the three-part test mandates preferential treatment for women *ab initio*, but because Brown has been found (under prong one) to have allocated its athletics participation opportunities so as to create a significant gender-based disparity with respect to these opportunities, and has failed (under prong two) to show a history and continuing practice of expansion of opportunities for the underrepresented gender. Brown's interpretation conflates prongs one and three and distorts the three-part test by reducing it to an abstract, mechanical determination of strict numerical proportionality. In short, Brown treats the three-part test for compliance as a one-part test for strict liability.

Brown also fails to recognize that Title IX's remedial focus is, quite properly, not on the overrepresented gender, but on the underrepresented gender; in this case, women. Title IX and its implementing regulations protect the class for whose special benefit the statute was enacted. *See Cannon*, 441 U.S. at 694, 99 S.Ct. at 1956. It is women and not men who have historically and who continue to be underrepresented in sports, not only at Brown, but at universities nationwide. *See Williams v. School Dist. of Bethlehem, Pa.*, 998 F.2d 168, 175 (1993) (observing that, although Title IX and its regulations apply equally to boys and girls, "it would require blinders to ignore that the motivation for promulgation of the regulation on athletics was the historic emphasis on boys' athletic programs to the exclusion of girls' athletic programs in high schools as well as col-

leges"), *cert. denied,* 510 U.S. 1043, 114 S.Ct. 689, 126 L.Ed.2d 656 (1994).

The prior panel held that "[t]he fact that the overrepresented gender is less than fully accommodated will not, in and of itself, excuse a shortfall in the provision of opportunities for the underrepresented gender." *Cohen II,* 991 F.2d at 899. Instead, the law requires that, absent a demonstration of continuing program expansion for the underrepresented gender under prong two of the three-part test, an institution must either provide athletics opportunities in proportion to the gender composition of the student body so as to satisfy prong one, or fully accommodate the interests and abilities of athletes of the underrepresented gender under prong three. *Id.* In other words,

If a school, like Brown, eschews the first two benchmarks of the accommodation test, electing to stray from substantial proportionality and failing to march uninterruptedly in the direction of equal athletic opportunity, it must comply with the third benchmark. To do so, the school must fully and effectively accommodate the underrepresented gender's interests and abilities, even if that requires it to give the underrepresented gender (in this case, women) what amounts to a larger slice of a shrinking athletic-opportunity pie.

*Id.* at 906.

We think it clear that neither the Title IX framework nor the district court's interpretation of it mandates a gender-based quota scheme. In our view, it is Brown's relative interests approach to the three-part test, rather than the district court's interpretation, that contravenes the language and purpose of the test and of the statute itself. To adopt the relative interests approach would be, not only to overrule *Cohen II,* but to rewrite the enforcing agency's interpretation of its own regulation so as to incorporate an entirely different standard for Title IX compliance. This relative interests standard would entrench and fix by law the significant gender-based disparity in athletics opportunities found by the district court to exist at Brown, a finding we have held to be not clearly erroneous. According to Brown's relative interests interpretation of the equal accommodation principle, the gender-based disparity in athletics participation opportunities at Brown is due to a lack of interest on the part of its female students, rather than to discrimination, and any attempt to remedy the disparity is, by definition, an unlawful quota. This approach is entirely contrary to "Congress's unmistakably clear mandate that educational institutions not use federal monies to perpetuate gender-based discrimination," *id.* at 907, and makes it virtually impossible to effectuate Congress's intent to eliminate sex discrimination in intercollegiate athletics.

### E.

Brown also claims error in the district court's failure to apply Title VII standards to its analysis of whether Brown's intercollegiate athletics program complies with Title IX. The district court rejected the analogy to Title VII, noting that, while Title VII "seeks to determine whether gender-neutral job openings have been filled without regard to gender[,] Title IX ... was designed to address the reality that sports teams, unlike the vast majority of jobs, *do* have official gender requirements, and this statute accordingly approaches the concept of discrimination differently from Title VII." *Cohen III,* 879 F.Supp. at 205.

It does not follow from the fact that § 1681(b) was patterned after a Title VII provision that Title VII standards should be applied to a Title IX analysis of whether an intercollegiate athletics program equally accommodates both genders, as Brown contends. While this court has approved the importation of Title VII standards into Title IX analysis, we have explicitly limited the crossover to the employment context. *See Cohen II,* 991 F.2d at 902 (citing *Lipsett v. University of P.R.,* 864 F.2d 881, 897 (1st Cir.1988)); *but see Brown v. Hot, Sexy and Safer Prods., Inc.,* 68 F.3d 525, 540 (1st Cir.1995) (Title VII sexual harassment standards applied to Title IX sexual harassment case in non-employment context), *cert. denied,* —— U.S. ——, 116 S.Ct. 1044, 134 L.Ed.2d 191 (1996).

As *Cohen II* recognized, "[t]he scope and purpose of Title IX, which merely conditions

government grants to educational institutions, are substantially different from those of Title VII, which sets basic employment standards." 991 F.2d at 902 (citation omitted). "[W]hereas Title VII is largely peremptory," Title IX is "largely aspirational," and thus, a "loosely laced buskin." *Id.; see also North Haven,* 456 U.S. at 521, 102 S.Ct. at 1917–18 (directing that Title IX must be accorded "a sweep as broad as its language").

It is imperative to recognize that athletics presents a distinctly different situation from admissions and employment and requires a different analysis in order to determine the existence *vel non* of discrimination. While the Title IX regime *permits* institutions to maintain gender-segregated teams, the law does not require that student-athletes attending institutions receiving federal funds must compete on gender-segregated teams; nor does the law require that institutions provide completely gender-integrated athletics programs.[14] To the extent that Title IX allows institutions to maintain single-sex teams and gender-segregated athletics programs, men and women do not compete against each other for places on team rosters. Accordingly, and notwithstanding Brown's protestations to the contrary, the Title VII concept of the "qualified pool" has no place in a Title IX analysis of equal opportunities for male and female athletes because women are not "qualified" to compete for positions on men's teams, and vice-versa. In addition, the concept of "preference" does not have the same meaning, or raise the same equality concerns, as it does in the employment and admissions contexts.

Brown's approach fails to recognize that, because gender-segregated teams are the norm in intercollegiate athletics programs, athletics differs from admissions and employment in analytically material ways. In providing for gender-segregated teams, intercollegiate athletics programs *necessarily* allocate opportunities separately for male and female students, and, thus, any inquiry into a claim of gender discrimination *must* compare the athletics participation opportunities provided for men with those provided for women. For this reason, and because recruitment of interested athletes is at the discretion of the institution, there is a risk that the institution will recruit only enough women to fill positions in a program that already under represents women, and that the smaller size of the women's program will have the effect of discouraging women's participation.

In this unique context, Title IX operates to ensure that the gender-segregated allocation of athletics opportunities does not disadvantage either gender. Rather than create a quota or preference, this unavoidably gender-conscious comparison merely provides for the allocation of athletics resources and participation opportunities between the sexes in a non-discriminatory manner. As the Seventh Circuit observed, "Congress itself recognized that addressing discrimination in athletics presented a unique set of problems not raised in areas such as employment and academics." *Kelley,* 35 F.3d at 270 (citing *Sex Discrimination Regulations, Hearings Before the Subcommittee on Post Secondary Education of the Committee on Education and Labor,* 94th Cong., 1st Sess. at 46, 54, 125, 129, 152, 177, 299–300 (1975); 118 Cong. Rec. 5807 (1972) (statement of Sen. Bayh); 117 Cong.Rec. 30,407 (1971) (same)).

---

**14.** *See* 34 C.F.R. § 106.41(b) (1995) ("[A] recipient *may* operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport.") (emphasis added). Nor do the regulations *require* institutions to field gender-integrated teams:

However, where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport.

*Id.*

Whether or not the institution maintains gender-segregated teams, it must provide "gender-blind equality of opportunity to its student body." *Cohen II,* 991 F.2d at 896. While this case presents only the example of members of the underrepresented gender seeking the opportunity to participate on single-sex teams, the same analysis would apply where members of the underrepresented gender sought opportunities to play on co-ed teams.

In contrast to the employment and admissions contexts, in the athletics context, gender is not an irrelevant characteristic. Courts and institutions must have some way of determining whether an institution complies with the mandate of Title IX and its supporting regulations to provide equal athletics opportunities for both genders, despite the fact that the institution maintains single-sex teams, and some way of fashioning a remedy upon a determination that the institution does not equally and effectively accommodate the interests and abilities of both genders. As the *Kelley* Court pointed out (in the context of analyzing the deference due the relevant athletics regulation and the Policy Interpretation):

> Undoubtedly the agency responsible for enforcement of the statute could have required schools to sponsor a women's program for every men's program offered and vice versa. . . . It was not unreasonable, however, for the agency to reject this course of action. Requiring parallel teams is a rigid approach that denies schools the flexibility to respond to the differing athletic interests of men and women. It was perfectly acceptable, therefore, for the agency to chart a different course and adopt an enforcement scheme that measures compliance by analyzing how a school has allocated its various athletic resources.

*Kelley*, 35 F.3d at 271 (footnotes omitted).

Each prong of the Policy Interpretation's three-part test determines compliance in this manner.

> Measuring compliance through an evaluation of a school's allocation of its athletic resources allows schools flexibility in meeting the athletic interests of their students and increases the chance that the actual interests of those students will be met. And if compliance with Title IX is to be measured through this sort of analysis, it is only practical that schools be given some clear way to establish that they have satisfied the requirements of the statute. The substantial proportionality contained in

Benchmark 1 merely establishes such a safe harbor.

*Id.* (citations omitted).

We find no error in the district court's refusal to apply Title VII standards in its inquiry into whether Brown's intercollegiate athletics program complies with Title IX. *See Cohen II*, 991 F.2d at 901 ("[T]here is no need to search for analogies where, as in the Title IX milieu, the controlling statutes and regulations are clear."). We conclude that the district court's application of the three-part test does not create a gender-based quota and is consistent with Title IX, 34 C.F.R. § 106.41, the Policy Interpretation, and the mandate of *Cohen II*.

### F.

Brown has contended throughout this litigation that the significant disparity in athletics opportunities for men and women at Brown is the result of a gender-based differential in the level of interest in sports and that the district court's application of the three-part test requires universities to provide athletics opportunities for women to an extent that exceeds their relative interests and abilities in sports. Thus, at the heart of this litigation is the question whether Title IX permits Brown to deny its female students equal opportunity to participate in sports, based upon its unproven assertion that the district court's finding of a significant disparity in athletics opportunities for male and female students reflects, not discrimination in Brown's intercollegiate athletics program, but a lack of interest on the part of its female students that is unrelated to a lack of opportunities.

We view Brown's argument that women are less interested than men in participating in intercollegiate athletics, as well as its conclusion that institutions should be required to accommodate the interests and abilities of its female students only to the extent that it accommodates the interests and abilities of its male students, with great suspicion. To assert that Title IX permits institutions to provide fewer athletics participation opportunities for women than for men, based upon the premise that women are

less interested in sports than are men, is (among other things) to ignore the fact that Title IX was enacted in order to remedy discrimination that results from stereotyped notions of women's interests and abilities.

Interest and ability rarely develop in a vacuum; they evolve as a function of opportunity and experience. The Policy Interpretation recognizes that women's lower rate of participation in athletics reflects women's historical lack of opportunities to participate in sports. *See* 44 Fed.Reg. at 71,419 ("Participation in intercollegiate sports has historically been emphasized for men but not women. Partially as a consequence of this, participation rates of women are far below those of men.").

Moreover, the Supreme Court has repeatedly condemned gender-based discrimination based upon "archaic and overbroad generalizations" about women. *Schlesinger v. Ballard,* 419 U.S. 498, 508, 95 S.Ct. 572, 577–78, 42 L.Ed.2d 610 (1975). *See, e.g., Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 725, 102 S.Ct. 3331, 3336–37, 73 L.Ed.2d 1090 (1982); *Califano v. Webster,* 430 U.S. 313, 317, 97 S.Ct. 1192, 1194–95, 51 L.Ed.2d 360 (1977); *Frontiero v. Richardson,* 411 U.S. 677, 684–86, 93 S.Ct. 1764, 1769–70, 36 L.Ed.2d 583 (1973). The Court has been especially critical of the use of statistical evidence offered to prove generalized, stereotypical notions about men and women. For example, in holding that Oklahoma's 3.2% beer statute invidiously discriminated against males 18–20 years of age, the Court in *Craig v. Boren,* 429 U.S. 190, 208–209, 97 S.Ct. 451, 462–463, 50 L.Ed.2d 397 (1976), stressed that "the principles embodied in the Equal Protection Clause are not to be rendered inapplicable by statistically measured but loose-fitting generalities." *See also id.* at 202, 97 S.Ct. at 463 ("statistics exhibit a variety of . . . shortcomings that seriously impugn their value to equal protection analysis"); *id.* at 204, 97 S.Ct. at 460–61 ("proving broad sociological propositions by statistics is a dubious business, and one that inevitably is in tension with the normative philosophy that underlies the Equal Protection Clause"); *Cannon,* 441 U.S. at 681 n. 2, 99 S.Ct. at 1949 n. 2 (observing with respect to the relevance of the University of Chicago's statistical evidence regarding the small number of female applicants to its medical school, in comparison to male applicants, that "the dampening impact of a discriminatory rule may undermine the relevance of figures relating to *actual* applicants").

Thus, there exists the danger that, rather than providing a true measure of women's interest in sports, statistical evidence purporting to reflect women's interest instead provides only a measure of the very discrimination that is and has been the basis for women's lack of opportunity to participate in sports. Prong three requires some kind of evidence of interest in athletics, and the Title IX framework permits the use of statistical evidence in assessing the level of interest in sports.[15] Nevertheless, to allow a numbers-

---

15. Under the Policy Interpretation,

Institutions may determine the athletic interests and abilities of students by nondiscriminatory methods of their choosing provided:

 a. The processes take into account the nationally increasing levels of women's interests and abilities;

 b. The methods of determining interest and ability do not disadvantage the members of an underrepresented sex;

 c. The methods of determining ability take into account team performance records; and

 d. The methods are responsive to the expressed interests of students capable of intercollegiate competition who are members of an underrepresented sex.

44 Fed.Reg. at 71,417.

The 1990 version of the Title IX Athletics Investigator's Manual, an internal agency document, instructs investigating officials to consider, *inter alia,* the following: (i) any institutional surveys or assessments of students' athletics interests and abilities, *see* Valerie M. Bonnette & Lamar Daniel, Department of Education, Title IX Athletics Investigator's Manual at 22 (1990); (ii) the "expressed interests" of the underrepresented gender, *id.* at 25; (iii) other programs indicative of interests and abilities, such as club and intramural sports, sports programs at "feeder" schools, community and regional sports programs, and physical education classes, *id.*

As the district court noted, however, the agency characterizes surveys as a "simple way to identify which additional sports might appropriately be created to achieve compliance. . . . Thus, a survey of interests would *follow* a determination that an institution does not satisfy prong three; it would not be utilized to make that determination in the first instance." *Cohen III,* 879 F.Supp. at 210 n. 51; *see* 1990 Investigator's Manual at 27 (explaining that a survey or assessment of interests and abilities is not re-

based lack-of-interest defense to become the instrument of further discrimination against the underrepresented gender would pervert the remedial purpose of Title IX. We conclude that, even if it can be empirically demonstrated that, at a particular time, women have less interest in sports than do men, such evidence, standing alone, cannot justify providing fewer athletics opportunities for women than for men. Furthermore, such evidence is completely irrelevant where, as here, viable and successful women's varsity teams have been demoted or eliminated.

We emphasize that, on the facts of this case, Brown's lack-of-interest arguments are of no consequence. As the prior panel recognized, while the question of full and effective accommodation of athletics interests and abilities is potentially a complicated issue where plaintiffs seek to create a new team or to elevate to varsity status a team that has never competed at the varsity level, no such difficulty is presented here, where plaintiffs seek to reinstate what were successful university-funded teams right up until the moment the teams were demoted.[16] *Cohen II,* 991 F.2d at 904; *see also Cohen I,* 809 F.Supp. at 992 ("Brown is cutting off varsity opportunities where there is great interest and talent, *and* where Brown still has an imbalance between men and women varsity athletes in relation to their undergraduate enrollments.").

■■■ On these facts, Brown's failure to accommodate fully and effectively the interests and abilities of the underrepresented gender is clearly established. *See* Clarification Memorandum at 8 ("If an institution has recently eliminated a viable team from the intercollegiate program, OCR will find that there is sufficient interest, ability, and available competition to sustain an intercollegiate team in that sport unless an institution can provide strong evidence that interest, ability or available competition no longer exists."); *id.* at 8–9 n. 2 ("While [other] indications of interest may be helpful to OCR in ascertaining likely interest on campus, particularly in the absence of more direct indicia[,] an institution is expected to meet the actual interests and abilities of its students and admitted students."). Under these circumstances, the district court's finding that there are interested women able to compete at the university-funded varsity level, *Cohen III,* 879 F.Supp. at 212, is clearly correct.

Finally, the tremendous growth in women's participation in sports since Title IX was enacted disproves Brown's argument that women are less interested in sports for reasons unrelated to lack of opportunity. *See, e.g.,* Mike Tharp et al., *Sports crazy! Ready, set, go. Why we love our games,* U.S. News & World Report, July 15, 1996, at 33–34 (attributing to Title IX the explosive growth of women's participation in sports and the debunking of "the traditional myth that women aren't interested in sports").

Brown's relative interests approach is not a reasonable interpretation of the three-part test. This approach contravenes the purpose of the statute and the regulation because it does not permit an institution or a district court to remedy a gender-based disparity in athletics participation opportunities. Instead, this approach freezes that disparity by law, thereby disadvantaging further the underrepresented gender. Had Congress intended to entrench, rather than change, the status quo—with its historical emphasis on men's participation opportunities to the detriment of women's opportunities—it need not

quired by the Title IX regulation or the Policy Interpretation but may be required as part of a remedy when OCR has concluded that an institution's current program does not equally effectively accommodate the interests and abilities of students). (We note that the text of the 1990 Investigator's Manual cited herein at page 25 was apparently at page 27 of the copy of the Manual before the district court.)

16. The district court found that the women's gymnastics team had won the Ivy League championship in 1989–90 and was a "thriving university-funded varsity team prior to the 1991 demotion;" that the donor-funded women's fencing team had been successful for many years and that its request to be upgraded to varsity status had been supported by the athletics director at the time; that the donor-funded women's ski team had been consistently competitive despite a meager budget; and that the club-status women's water polo team had demonstrated the interest and ability to compete at full varsity status. *Cohen III,* 879 F.Supp. at 190.

have gone to all the trouble of enacting Title IX.

## V.

In the first appeal, this court rejected Brown's Fifth Amendment equal protection challenge to the statutory scheme. *Cohen II*, 991 F.2d at 900–901. Here, Brown argues that its challenge is to the decision of the district court. As Brown puts it, "[t]he [equal protection] violation arises from the court's holding that Title IX requires the imposition of quotas, preferential treatment, and disparate treatment in the absence of a compelling state interest and a determination that the remedial measure is 'narrowly tailored' to serve that interest." Reply Br. at 18 (citing *Adarand*, ⸺ U.S. at ⸺, 115 S.Ct. at 2117).

### A.

■ To the extent that Brown challenges the constitutionality of the statutory scheme itself, the challenge rests upon at least two erroneous assumptions: first, that *Adarand* is controlling authority on point that compels us, not only to consider Brown's constitutional challenge anew, but also to apply strict scrutiny to the analysis; second, that the district court's application of the law in its liability analysis on remand is inconsistent with the interpretation expounded in the prior appeal. We reject both premises.[17] Brown's implicit reliance on *Adarand* as contrary intervening controlling authority that warrants a departure from the law of the case doctrine is misplaced because, while *Adarand* does make new law, the law it makes is wholly irrelevant to the disposition of this appeal, and, even if *Adarand* did apply, it does not mandate the level of scrutiny to be applied to gender-conscious government action.

In rejecting Brown's equal protection claim, the *Cohen II* panel stated, "It is clear

that Congress has broad powers under the Fifth Amendment to remedy past discrimination." 991 F.2d at 901. The panel cited as authority *Metro Broadcasting*, 497 U.S. at 565–66, 110 S.Ct. at 3008–10 (for the proposition that "Congress need not make specific findings of discrimination to grant race-conscious relief"), and *Califano v. Webster*, 430 U.S. at 317, 97 S.Ct. at 1194–95 (noting that *Webster* upheld a social security wage law that benefitted women "in part because its purpose was 'the permissible one of redressing our society's longstanding disparate treatment of women'"). *Cohen II*, 991 F.2d at 901. The panel also noted that, in spite of the scant legislative history regarding Title IX as it applies to athletics, Congress heard a great deal of testimony regarding discrimination against women in higher education and acted to reverse the Supreme Court's decision in *Grove City College v. Bell*, 465 U.S. 555, 573–74, 104 S.Ct. 1211, 1221–22, 79 L.Ed.2d 516 (1984) (holding that Title IX was "program-specific" and thus applied only to those university programs that actually receive federal funds and not to the rest of the university), with athletics prominently in mind. *Cohen II*, 991 F.2d at 901.

In *Metro Broadcasting*, the Court upheld two federally mandated race-based preference policies under intermediate scrutiny. 497 U.S. at 564–65, 110 S.Ct. at 3008–09 (holding that benign race-conscious measures mandated by Congress "are constitutionally permissible to the extent that they serve important governmental objectives within the power of Congress and are substantially related to achievement of those objectives"). The *Metro Broadcasting* Court applied intermediate scrutiny, notwithstanding that the previous year, in *Croson*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854, the Court applied strict scrutiny in striking down a municipal minority set-aside program for city construction contracts. The *Metro Broadcasting* Court distinguished *Croson*, noting that "[i]n

---

**17.** We assume, without deciding, that Brown has not waived its equal protection claim and has standing to raise it. Appellees argue that this claim is waived because Brown did not raise it in the district court. Appellee's Br. at 55 (citing *Desjardins v. Van Buren Community Hosp.*, 969 F.2d 1280, 1282 (1st Cir.1992)). Appellees also

argue that, to the extent that the equal protection claim is viable, Brown lacks standing to raise it. Appellee's Br. at 56 (citing *Powers v. Ohio*, 499 U.S. 400, 409–11, 111 S.Ct. 1364, 1370–71, 113 L.Ed.2d 411 (1991)). Given our disposition of this claim, we do not address these arguments.

fact, much of the language and reasoning in *Croson* reaffirmed the lesson of *Fullilove* [18] that race-conscious classifications adopted by Congress to address racial and ethnic discrimination are subject to a different standard than such classifications prescribed by state and local governments." *Metro Broadcasting*, 497 U.S. at 565, 110 S.Ct. at 3008.

*Adarand* overruled *Metro Broadcasting* to the extent that *Metro Broadcasting* is inconsistent with *Adarand*'s holding that "all racial classifications, imposed by whatever federal, state, or local government actor, must be analyzed by a reviewing court under strict scrutiny." *Adarand*, — U.S. at —, 115 S.Ct. at 2113. Brown impliedly assumes that *Adarand*'s partial overruling of *Metro Broadcasting* invalidates the prior panel's disposition of Brown's equal protection challenge by virtue of its passing citation to *Metro Broadcasting*. This assumption is erroneous because the proposition for which *Cohen II* cited *Metro Broadcasting* as authority has not been vitiated by *Adarand*, is of no consequence to our disposition of the issues raised in this litigation, and is, in any event, unchallenged here.[19]

### B.

■■■■ The prior panel rejected Brown's Fifth Amendment equal protection [20] and "affirmative action" challenges to the statutory scheme. *Cohen II*, 991 F.2d at 901 (finding no constitutional infirmity, assuming *arguen-*

*do*, that the regulation creates a classification somewhat in favor of women). Thus, to the extent that Brown challenges the statutory scheme itself, that challenge is foreclosed under the law of the case doctrine. Nevertheless, the remedy ordered for a violation of a federal anti-discrimination statute is still subject to equal protection review, assuming that it constitutes gender-conscious government action. *See Miller*, — U.S. at —, 115 S.Ct. at 2491. Therefore, we review the constitutionality of the district court's order requiring Brown to comply with Title IX by accommodating fully and effectively the athletics interests and abilities of its women students. Because the challenged classification is gender-based, it must be analyzed under the intermediate scrutiny test. Before proceeding to the analysis, however, we must first address Brown's challenge to the standard of review.

Brown concedes that *Adarand* "does not, in partially overruling *Metro Broadcasting*, set forth the proper standard of review for this case." Appellant's Br. at 29. Nevertheless, Brown asserts that "[w]hile *Adarand* is a case involving racial classification, its analysis clearly applies to gender classification as well." *Id.* at 27. Further, inappropriately relying on *Frontiero*, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583, and *Croson*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854, Brown concludes that strict scrutiny applies to gender-based classifications.[21] Appellant's Br.

---

**18.** In *Fullilove*, a plurality of the Court applied a standard subsequently acknowledged to be intermediate scrutiny, *see Metro Broadcasting*, 497 U.S. at 564, 110 S.Ct. at 3008, in upholding against a Fifth Amendment equal protection challenge a benign race-based affirmative action program that was adopted by an agency at the explicit direction of Congress. The *Fullilove* plurality inquired "whether the *objectives* of th[e] legislation are within the power of Congress [ ]" and "whether the limited use of racial and ethnic criteria ... is a constitutionally permissible *means* for achieving the congressional objectives." 448 U.S. at 473, 100 S.Ct. at 2772.

**19.** *Cohen II* cited *Metro Broadcasting* for a general principle regarding Congress's broad powers to remedy discrimination, a proposition that was not reached by *Adarand*. Moreover, *Webster*, which *Cohen II* cited along with *Metro Broadcasting*, was not overruled or in any way rendered suspect by *Adarand*.

**20.** It is well settled that the reach of the equal protection guarantee of the Fifth Amendment Due Process Clause—the basis for Brown's equal protection claim—is coextensive with that of the Fourteenth Amendment Equal Protection Clause. *E.g.*, *United States v. Paradise*, 480 U.S. at 166 n. 16, 107 S.Ct. at 1064 n. 16; *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 1228 n. 2, 43 L.Ed.2d 514 (1975).

**21.** In *Frontiero*, a plurality of the Court concluded that gender-based classifications, "like classifications based upon race, alienage, or national origin, are inherently suspect, and must therefore be subjected to strict judicial scrutiny." 411 U.S. at 688, 93 S.Ct. at 1771. In the 23 years that have since elapsed, this position has never commanded a majority of the Court, and has never been adopted by this court. Whatever may be the merits of adopting strict scrutiny as the standard to be applied to gender-based classifica-

at 29; Reply Br. at 19–20. These conclusory assertions do not comport with the law in this circuit.

First, as explained earlier, *Adarand* and *Croson* apply to review of legislative affirmative action schemes. This case presents the issue of the legality of a federal district court's determination, based upon adjudicated findings of fact, that a federal anti-discrimination statute has been violated, and of the statutory and constitutional propriety of the judicial remedy ordered to provide redress to plaintiffs with standing who have been injured by the violation.

Second, *Adarand* does not even discuss gender discrimination, and its holding is limited to explicitly race-based classifications. — U.S. at —, 115 S.Ct. at 2113. It can hardly be *assumed* that the Court intended to include gender-based classifications within *Adarand*'s precedential scope or to elevate, *sub silentio*, the level of scrutiny to be applied by a reviewing court to such classifications.

Third, even if *Adarand* did apply, it does not dictate the level of scrutiny to be applied in this case, as Brown concedes. For the last twenty years, the Supreme Court has applied intermediate scrutiny to all cases raising equal protection challenges to gender-based classifications, including the Supreme Court's most recent gender discrimination case, *United States v. Virginia,* — U.S. —, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) ("*Virginia*"); *see id.* at —, 116 S.Ct. at 2288 (Rehnquist, C.J., concurring in the judgment) (collecting cases).[22]

Fourth, it is important to recognize that controlling authority does not distinguish between invidious and benign discrimination in the context of gender-based classifications, as it has in the context of racial classifications. Neither this court nor the Supreme Court has drawn this distinction in the context of gender discrimination claims or held that a less stringent standard applies in cases involving benign, rather than invidious, gender discrimination. *See Hogan,* 458 U.S. at 724 & n. 9, 102 S.Ct. at 3336 & n. 9 (reviewing benign gender-conscious admissions policy under intermediate scrutiny and recognizing that the analysis does not change with the objective of the classification); *accord Wygant,* 476 U.S. at 273, 106 S.Ct. at 1846–47. Thus, the analytical result would be same, even if this were an affirmative action case.

■■■ Under intermediate scrutiny, the burden of demonstrating an exceedingly per-

---

tions, it is inappropriate to suggest, as Brown does, that *Frontiero* compels its application here.

Brown's assertion that *Adarand* obligates this court to apply *Croson* to its equal protection claim is also incorrect. As noted previously, *Croson* is an affirmative action case and does not control review of a judicial determination that a federal anti-discrimination statute has been violated. To the extent that Brown assumes that *Croson* governs the issue of the sufficiency of the factual predicate required to uphold a federally mandated, benign race- or gender-based classification, that assumption is also unfounded. As we have explained, *Croson*'s factual concerns are not raised by a district court's determination—predicated upon duly adjudicated factual findings bearing multiple indicia of reliability and specificity—of gender discrimination in violation of a federal statute. We also point out that *Adarand* did not reach the question of the sufficiency of the factual predicate required to satisfy strict scrutiny review of a congressionally mandated race-based classification.

**22.** We point out that *Virginia* adds nothing to the analysis of equal protection challenges to gender-based classifications that has not been part of that analysis since 1979, long before *Cohen II*

was decided. While the *Virginia* Court made liberal use of the phrase "exceedingly persuasive justification," and sparse use of the formulation "substantially related to an important governmental objective," the Court nevertheless struck down the gender-based admissions policy at issue in that case under intermediate scrutiny, — U.S. at —, —, 116 S.Ct. at 2271, 2275; *id.* at —, 116 S.Ct. at 2288 (Rehnquist, C.J., concurring in the judgment), the standard applied to gender-based classifications since 1976, when it was first announced in *Craig v. Boren,* 429 U.S. at 197, 97 S.Ct. at 456, and the test applied in both *Metro Broadcasting* and *Webster.*

The phrase "exceedingly persuasive justification" has been employed routinely by the Supreme Court in applying intermediate scrutiny to gender discrimination claims and is, in effect, a short-hand expression of the well-established test. *See Personnel Adm'r v. Feeney,* 442 U.S. 256, 273, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979); *Kirchberg v. Feenstra,* 450 U.S. 455, 461, 101 S.Ct. 1195, 1199, 67 L.Ed.2d 428 (1981); *Hogan,* 458 U.S. at 724, 102 S.Ct. at 3336; *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 136–37, 114 S.Ct. 1419, ———, 128 L.Ed.2d 89 (1994).

suasive justification for a government-imposed, gender-conscious classification is met by showing that the classification serves important governmental objectives, and that the means employed are substantially related to the achievement of those objectives. *E.g., Hogan,* 458 U.S. at 724, 102 S.Ct. at 3336. Applying that test, it is clear that the district court's remedial order passes constitutional muster.

We find that the first part of the test is satisfied. The governmental objectives of "avoid[ing] the use of federal resources to support discriminatory practices," and "provid[ing] individual citizens effective protection against those practices," *Cannon,* 441 U.S. at 704, 99 S.Ct. at 1961, are clearly important objectives. We also find that judicial enforcement of federal anti-discrimination statutes is at least an important governmental objective.

Applying the second prong of the intermediate scrutiny test, we find that the means employed by the district court in fashioning relief for the statutory violation are clearly substantially related to these important objectives. Intermediate scrutiny does not require that there be no other way to accomplish the objectives, but even if that were the standard, it would be satisfied in the unique context presented by the application of Title IX to athletics.

■ As explained previously, Title IX as it applies to athletics is distinct from other anti-discrimination regimes in that it is impossible to determine compliance or to devise a remedy without counting and comparing opportunities with gender explicitly in mind. Even under the individual rights theory of equal protection, reaffirmed in *Adarand,* ―― U.S. at ――, 115 S.Ct. at 2112 (the equal protection guarantee "protect[s] persons, not groups"), the only way to determine whether the rights of an individual athlete have been violated and what relief is necessary to remedy the violation is to engage in an explicitly gender-conscious comparison. Accordingly,

even assuming that the three-part test creates a gender classification that favors women, allowing consideration of gender in determining the remedy for a Title IX violation serves the important objective of "ensur[ing] that in instances where overall athletic opportunities decrease, the actual opportunities available to the underrepresented gender do not." *Kelley,* 35 F.3d at 272. In addition, a gender-conscious remedial scheme is constitutionally permissible if it directly protects the interests of the disproportionately burdened gender. *See Hogan,* 458 U.S. at 728, 102 S.Ct. at 3338 ("In limited circumstances, a gender-based classification favoring one sex can be justified if it intentionally and directly assists members of the sex that is disproportionately burdened.").

Under Brown's interpretation of the three-part test, there can never be a remedy for a violation of Title IX's equal opportunity mandate. In concluding that the district court's interpretation and application of the three-part test creates a quota, Brown errs, in part, because it fails to recognize that (i) the substantial proportionality test of prong one is only the starting point, and not the conclusion, of the analysis; and (ii) prong three is not implicated unless a gender-based disparity with respect to athletics participation opportunities has been shown to exist. Where such a disparity has been established, the inquiry under prong three is whether the athletics interests and abilities of the underrepresented gender are fully and effectively accommodated, such that the institution may be found to comply with Title IX, notwithstanding the disparity.[23]

Of course, a remedy that requires an institution to cut, add, or elevate the status of athletes or entire teams may impact the genders differently, but this will be so only if there is a gender-based disparity with respect to athletics opportunities to begin with, which is the only circumstance in which prong three comes into play. Here, however, it has not been shown that Brown's men students will be disadvantaged by the full

---

**23.** Under the three-part test, the institution may also excuse the disparity under prong two, by showing a "history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities

of the [underrepresented gender]," 44 Fed.Reg. at 71,418, in which case the compliance inquiry ends without reaching prong three. It has been determined that Brown cannot avail itself of this defense. *See Cohen III,* 879 F.Supp. at 211.

and effective accommodation of the athletics interests and abilities of its women students.

## VI.

■ Brown assigns error to the district court's exclusion of certain evidence pertaining to the relative athletics interests of men and women. Reviewing the district court's evidentiary rulings for abuse of discretion, *see Sinai v. New England Tel. and Tel. Co.,* 3 F.3d 471, 475 (1st Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 597, 130 L.Ed.2d 509 (1994), we find none.

■ Brown first contends that the court erred in barring cross-examination of plaintiffs' expert Dr. Sabor on the issue of why girls drop out of sports before reaching college. Because Dr. Sabor's direct testimony did not address this issue, it was within the district court's discretion to limit cross-examination "to the subject matter of the direct examination." Fed.R.Evid. 611(b); *see Ferragamo v. Chubb Life Ins. Co. of Am.,* 94 F.3d 26, 28 (1st Cir.1996).

■ Brown also suggests that the district court's exclusion of statistical and survey data offered in support of its relative interests argument constitutes error. Although the district court excluded as full exhibits two studies, the NCAA Gender Equity Study and the results of an undergraduate poll on student interest in athletics, it nevertheless permitted Brown's experts to rely on the data contained in these two reports as a basis for their expert opinions.[24] Because Brown's experts relied upon the excluded data in providing their opinions on the issue of a gender-based differential in student interest in athletics, the evidence was before the trier of fact and any error was, therefore, harmless. *See McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 553, 104 S.Ct. 845, 848–49, 78 L.Ed.2d 663 (1984) (instructing appellate courts to "ignore errors that do not affect the essential fairness of the trial").

24. Brown also contends that the district court erred in excluding the NCAA Annual Report. Appellant's Br. at 56–57. Brown merely asserts, however, that the "study was admissible under Rule 803," *id.* at 57, and offers no explanation as to how it was prejudiced by the exclusion. Accordingly, we deem the argument waived. *Ryan*

## VII.

It does not follow from our statutory and constitutional analyses that we endorse the district court's remedial order. Although we decline Brown's invitation to find that the district court's remedy was an abuse of discretion, we do find that the district court erred in substituting its own specific relief in place of Brown's statutorily permissible proposal to comply with Title IX by cutting men's teams until substantial proportionality was achieved.

■ In *Cohen II* we stated that it is "established beyond peradventure that, where no contrary legislative directive appears, the federal judiciary possesses the power to grant *any* appropriate relief on a cause of action appropriately brought pursuant to a federal statute." 991 F.2d at 901 (citing *Franklin,* 503 U.S. at 70–71, 112 S.Ct. at 1035–36). We also observed, however, that "[w]e are a society that cherishes academic freedom and recognizes that universities deserve great leeway in their operations." 991 F.2d at 906 (citing *Wynne v. Tufts Univ. Sch. of Med.,* 976 F.2d 791, 795 (1st Cir.1992), *cert. denied,* 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993); *Lamphere v. Brown Univ.,* 875 F.2d 916, 922 (1st Cir.1989)). Nevertheless, we have recognized that academic freedom does not embrace the freedom to discriminate. *Villanueva v. Wellesley College,* 930 F.2d 124, 129 (1st Cir.1991) (citations omitted).

The district court itself pointed out that Brown may achieve compliance with Title IX in a number of ways:

It may eliminate its athletic program altogether, it may elevate or create the requisite number of women's positions, it may demote or eliminate the requisite number of men's positions, or it may implement a combination of these remedies. I leave it entirely to Brown's discretion to decide

*v. Royal Ins. Co. of Am.,* 916 F.2d 731, 734 (1st Cir.1990) ("It is settled in this circuit that issues adverted to on appeal in a perfunctory manner, unaccompanied by some developed argumentation, are deemed to have been abandoned.") (citations omitted).

how it will balance its program to provide equal opportunities for its men and women athletes. I recognize the financial constraints Brown faces; however, its own priorities will necessarily determine the path to compliance it elects to take.

*Cohen III,* 879 F.Supp. at 214; *see also Cohen II,* 991 F.2d at 898 n. 15 (noting that a school may achieve compliance with Title IX by "reducing opportunities for the overrepresented gender").

■ With these precepts in mind, we first examine the compliance plan Brown submitted to the district court in response to its order. We then consider the district court's order rejecting Brown's plan and the specific relief ordered by the court in its place.

Brown's proposed compliance plan stated its goal as follows:

The plan has one goal: to make the gender ratio among University-funded teams at Brown substantially proportionate to the gender ratio of the undergraduate student body. To do so, the University must disregard the expressed athletic interests of one gender while providing advantages for others. *The plan focuses only on University-funded sports, ignoring the long history of successful donor-funded student teams.*

Brown's Plan at 1 (emphasis added).

In its introduction, Brown makes clear that it "would prefer to maintain its current program" and that the plan submitted

is inconsistent with Brown's philosophy to the extent that it grants advantages and enforces disadvantages upon student athletes solely because of their gender and curbs the historic role of coaches in determining the number of athletes which can be provided an opportunity to participate. Nevertheless, the University wishes to act in good faith with the order of the Court, notwithstanding issues of fact and law which are currently in dispute.

*Id.* at 2.

Brown states that it "seeks to address the issue of proportionality while minimizing additional undue stress on already strained physical and fiscal resources." *Id.*

The general provisions of the plan may be summarized as follows: (i) Maximum squad sizes for men's teams will be set and enforced. (ii) Head coaches of all teams must field squads that meet minimum size requirements. (iii) No additional discretionary funds will be used for athletics. (iv) Four new women's junior varsity teams—basketball, lacrosse, soccer, and tennis—will be university-funded. (v) Brown will make explicit a *de facto* junior varsity team for women's field hockey. *Id.* at 3–4.

The plan sets forth nine steps for its implementation, *id.* at 4–5, and concludes that "if the Court determines that this plan is not sufficient to reach proportionality, phase two will be the elimination of one or more men's teams," *id.* at 5.

The district court found Brown's plan to be "fatally flawed" for two reasons. First, despite the fact that 76 men and 30 women participated on donor-funded varsity teams, Brown's proposed plan disregarded donor-funded varsity teams. District Court Order at 5–6. Second, Brown's plan "artificially boosts women's varsity numbers by adding junior varsity positions on four women's teams." *Id.* at 6. As to the propriety of Brown's proposal to come into compliance by the addition of junior varsity positions, the district court held:

Positions on distinct junior varsity squads do not qualify as "intercollegiate competition" opportunities under the Policy Interpretation and should not be included in defendants' plan. As noted in *Cohen,* 879 F.Supp. at 200, "intercollegiate" teams are those that "regularly participate in varsity competition." *See* 44 Fed.Reg. at 71,413 n. 1. Junior varsity squads, by definition, do not meet this criterion. Counting new women's junior varsity positions as equivalent to men's full varsity positions flagrantly violates the spirit and letter of Title IX; in no sense is an institution providing equal opportunity if it affords varsity positions to men but junior varsity positions to women.

District Court Order at 6 (footnote omitted).

The district court found that these two flaws in the proposed plan were sufficient to show that Brown had "not made a good faith

effort to comply with this Court's mandate." *Id.* at 8.

In criticizing another facet of Brown's plan, the district court pointed out that

[a]n institution does not provide equal opportunity if it caps its men's teams after they are well-stocked with high-caliber recruits while requiring women's teams to boost numbers by accepting walk-ons. A university does not treat its men's and women's teams equally if it allows the coaches of men's teams to set their own maximum capacity limits but overrides the judgment of coaches of women's teams on the same matter.

*Id.* at 8–9.

After rejecting Brown's proposed plan, but bearing in mind Brown's stated objectives, the district court fashioned its own remedy:

I have concluded that Brown's stated objectives will be best served if I design a remedy to meet the requirements of prong three rather than prong one. In order to bring Brown into compliance with prong one under defendants' Phase II, I would have to order Brown to cut enough men's teams to eradicate approximately 213 men's varsity positions. This extreme action is entirely unnecessary. The easy answer lies in ordering Brown to comply with prong three by upgrading the women's gymnastics, fencing, skiing, and water polo teams to university-funded varsity status. In this way, Brown could easily achieve prong three's standard of "full and effective accommodation of the underrepresented sex." This remedy would entail upgrading the positions of approximately 40 women. In order to finance the 40 additional women's positions, Brown certainly will not have to eliminate as many as the 213 men's positions that would be cut under Brown's Phase II proposal. Thus, Brown will fully comply with Title IX by meeting the standards of prong three, *without approaching satisfaction of the standards of prong one.*

It is clearly in the best interest of both the male and the female athletes to have an increase in women's opportunities and a small decrease in men's opportunities, if necessary, rather than, as under Brown's plan, *no* increase in women's opportunities and a *large* decrease in men's opportunities. Expanding women's athletic opportunities in areas where there is proven ability and interest is the very purpose of Title IX and the simplest, least disruptive, route to Title IX compliance at Brown.

*Id.* at 11–12.

The district court ordered Brown to "elevate and maintain women's gymnastics, women's water polo, women's skiing, and women's fencing to university-funded varsity status." *Id.* at 12. The court stayed this part of the order pending appeal and further ordered that, in the interim, the preliminary injunction prohibiting Brown from eliminating or demoting any existing women's varsity team would remain in effect. *Id.*

We agree with the district court that Brown's proposed plan fell short of a good faith effort to meet the requirements of Title IX as explicated by this court in *Cohen II* and as applied by the district court on remand. Indeed, the plan is replete with argumentative statements more appropriate for an appellate brief. It is obvious that Brown's plan was addressed to this court, rather than to offering a workable solution to a difficult problem.

It is clear, nevertheless, that Brown's proposal to cut men's teams is a permissible means of effectuating compliance with the statute. Thus, although we understand the district court's reasons for substituting its own specific relief under the circumstances at the time, and although the district court's remedy is within the statutory margins and constitutional, we think that the district court was wrong to reject out-of-hand Brown's alternative plan to reduce the number of men's varsity teams. After all, the district court itself stated that one of the compliance options available to Brown under Title IX is to "demote or eliminate the requisite number of men's positions." *Cohen III*, 879 F.Supp. at 214. Our respect for academic freedom and reluctance to interject ourselves into the conduct of university affairs counsels that we give universities as much freedom as possible in conducting their operations consonant with

constitutional and statutory limits. *Cohen II,* 991 F.2d at 906; *Villanueva,* 930 F.2d at 129.

Brown therefore should be afforded the opportunity to submit another plan for compliance with Title IX. The context of the case has changed in two significant respects since Brown presented its original plan. First, the substantive issues have been decided adversely to Brown. Brown is no longer an appellant seeking a favorable result in the Court of Appeals. Second, the district court is not under time constraints to consider a new plan and fashion a remedy so as to expedite appeal. Accordingly, we remand the case to the district court so that Brown can submit a further plan for its consideration. In all other respects the judgment of the district court is affirmed. The preliminary injunction issued by the district court in *Cohen I,* 809 F.Supp. at 1001, will remain in effect pending a final remedial order.

### VIII.

There can be no doubt that Title IX has changed the face of women's sports as well as our society's interest in and attitude toward women athletes and women's sports. *See, e.g.,* Frank DeFord, *The Women of Atlanta,* Newsweek, June 10, 1996, at 62–71; Tharp, *supra,* at 33; Robert Kuttner, *Vicious Circle of Exclusion,* Washington Post, September 4, 1996, at A15. In addition, there is ample evidence that increased athletics participation opportunities for women and young girls, available as a result of Title IX enforcement, have had salutary effects in other areas of societal concern. *See* DeFord, *supra,* at 66.

One need look no further than the impressive performances of our country's women athletes in the 1996 Olympic Summer Games to see that Title IX has had a dramatic and positive impact on the capabilities of our women athletes, particularly in team sports. These Olympians represent the first full generation of women to grow up under the aegis of Title IX. The unprecedented success of these athletes is due, in no small measure, to Title IX's beneficent effects on women's sports, as the athletes themselves have acknowledged time and again. What stimulated this remarkable change in the quality of

women's athletic competition was not a sudden, anomalous upsurge in women's interest in sports, but the enforcement of Title IX's mandate of gender equity in sports. Kuttner, *supra,* at A15.

**Affirmed in part, reversed in part, and remanded for further proceedings. No costs on appeal to either party.**

TORRUELLA, Chief Judge (dissenting).

Because I am not persuaded that the majority's view represents the state of the law today, I respectfully dissent.

### I. THE LAW OF THE CASE

Under the doctrine of the "law of the case," a decision on an issue of law made by the court at one stage of a case becomes a binding precedent to be followed in successive stages of the same litigation except in unusual circumstances. *See Abbadessa v. Moore Business Forms, Inc.,* 987 F.2d 18, 22 (1st Cir.1993); *EEOC v. Trabucco,* 791 F.2d 1, 2 (1st Cir.1986). It is well established, however, that a decision of the Supreme Court, that is rendered between two appeals and is irreconcilable with the decision on the first appeal, must be followed on the second appeal. *See Linkletter v. Walker,* 381 U.S. 618, 627, 85 S.Ct. 1731, 1736–37, 14 L.Ed.2d 601 (1965); *Metcalf & Eddy, Inc. v. Puerto Rico Aqueduct and Sewer Auth.,* 945 F.2d 10, 12 (1st Cir.1991), *rev'd on other grounds,* 506 U.S. 139, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993); *Young v. Herring,* 917 F.2d 858 (5th Cir.1990); *Fogel v. Chestnutt,* 668 F.2d 100, 109 (2d Cir.1981), *cert. denied,* 459 U.S. 828, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982). I believe that we face such a situation in the instant case.

#### A. *Adarand* and *Metro Broadcasting*

At the time of *Cohen v. Brown University,* 991 F.2d 888 (1st Cir.1993) (*Cohen II* ), the standard intermediate scrutiny test for discriminatory classifications based on sex required that "a statutory classification must be substantially related to an important government objective." *Clark v. Jeter,* 486 U.S. 456, 461, 108 S.Ct. 1910, 1914, 100 L.Ed.2d 465 (1988); *see also Mississippi Univ. for*

*Women v. Hogan,* 458 U.S. 718, 723–24, and n. 9, 102 S.Ct. 3331, 3335–36 and n. 9, 73 L.Ed.2d 1090 (1982); *Mills v. Habluetzel,* 456 U.S. 91, 99, 102 S.Ct. 1549, 1554–55, 71 L.Ed.2d 770 (1982); *Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 456–57, 50 L.Ed.2d 397 (1976); *Mathews v. Lucas,* 427 U.S. 495, 505–06, 96 S.Ct. 2755, 2762–63, 49 L.Ed.2d 651 (1976). As was also the case under strict scrutiny review prior to *Adarand Constructors, Inc. v. Pena,* —— U.S. ——, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995), however, courts applying intermediate scrutiny sometimes allowed "benign" gender classifications on the grounds that they were a "reasonable means of compensating women as a class for past … discrimination." Ronald D. Rotunda & John E. Novack, 3 *Treatise on Constitutional Law* § 18.23, at 277; *see Califano v. Webster,* 430 U.S. 313, 317, 97 S.Ct. 1192, 1194–95, 51 L.Ed.2d 360 (1977) (allowing women to compute certain social security benefits with a more favorable formula than could be used by men); *Lewis v. Cowen,* 435 U.S. 948, 98 S.Ct. 1572, 55 L.Ed.2d 797 (1978) (summary affirmance of a district court decision upholding a provision of the Railroad Retirement Act that allowed women to retire at age 60 while men could not retire until age 65).

In *Cohen II,* we applied precisely this type of benign-classification analysis to what we viewed to be benign gender discrimination by the federal government. Although *Cohen II,* in its brief discussion of the equal protection issue, does not specify the precise standard it used, the court stated that "even if we were to assume … that the regulation creates a gender classification slanted somewhat in favor of women, we would find no constitutional infirmity." *Cohen II,* 991 F.2d at 901. Note that the focus is on the government's ability to favor women in this context, rather than on an "important government objective," suggesting that the court considered the issue to be one of benign discrimination. Indeed, no governmental interest is even identified in *Cohen II.* Furthermore, both of the cases cited by the court in *Cohen II* are cases in which a suspect classification was allowed because it was judged benign, *see id.* at 901 (citing *Metro Broadcasting Inc. v. FCC,* 497 U.S. 547, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990) (race); *Califano v. Webster,* 430 U.S. 313, 97 S.Ct. 1192, 51 L.Ed.2d 360 (1977) (sex)).

*Cohen II*'s assumption that a regulation slanted in favor of women would be permissible, *Cohen II* 991 F.2d at 901, and by implication that the same regulation would be impermissible if it favored men, was based on *Metro Broadcasting,* which held that benign race-based action by the federal government was subject to a lower standard than nonremedial race-based action. *See Metro Broadcasting,* 497 U.S. at 564, 110 S.Ct. at 3008. Specifically, the Supreme Court announced that

benign race-conscious measures mandated by Congress are constitutionally permissible *to the extent that they serve important governmental objectives within the power of Congress and are substantially related to achievement of those objectives.*

*Id.* at 565, 110 S.Ct. at 3026 (emphasis added). Although *Metro Broadcasting* explicitly discussed race-conscious rather than gender-conscious classifications, we applied its standard in *Cohen II. See Cohen II,* 991 F.2d at 901.

Since *Cohen II,* however, *Metro Broadcasting* has been overruled, at least in part. *See Adarand Constr. Inc. v. Pena,* —— U.S. ——, ——, 115 S.Ct. 2097, 2111–12, 132 L.Ed.2d 158 (1995). In *Adarand,* the Supreme Court held that "all racial classifications … must be analyzed under strict scrutiny." *Adarand,* —— U.S. at ——, 115 S.Ct. at 2113. The Court in *Adarand* singled out *Metro Broadcasting* as a "significant departure" from much of the Equal Protection jurisprudence that had come before it, in part because it suggested that "benign" government race-conscious classifications should be treated less skeptically than others. *See Adarand,* —— U.S. at ——, 115 S.Ct. at 2112.

In *Adarand,* the Supreme Court reasoned that "'it may not always be clear that a so-called preference is in fact benign.'" *Id.* (quoting *Regents of Univ. of Cal. v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (opinion of Powell, J.)). Additionally, the Supreme Court endorsed the view that

[a]bsent searching judicial inquiry into the justification for such race-based measures, there is simply no way of determining what classifications are 'benign' or 'remedial' and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics.

*Id.* at ——, 115 S.Ct. at 2112; *see also Richmond v. J.A. Croson Co.,* 488 U.S. 469, 493, 109 S.Ct. 706, 721–22, 102 L.Ed.2d 854 (1989).

It is not necessary to equate race and gender to see that the logic of *Adarand*—counseling that we focus on the categories and justifications proffered rather than the labels attached—applies in the context of gender. While cognizant of differences between race-focused and gender-focused Equal Protection precedent, I nevertheless think that *Adarand* compels us to view so-called "benign" gender-conscious governmental actions under the same lens as any other gender-conscious governmental actions. *See Adarand,* —— U.S. at ——, 115 S.Ct. at 2112; *see also United States v. Virginia,* —— U.S. ——, ——, ——, 116 S.Ct. 2264, 2274, 2277, 135 L.Ed.2d 735 (1996) (viewing Virginia's benign justification for a gender classification skeptically); *Shuford v. Alabama State Bd. of Educ.,* 897 F.Supp. 1535, 1557 (D.Ala.1995) (stating that courts "must look behind the recitation of a benign purpose to ensure that sex-based classifications redress past discrimination"). Rather than conduct an inquiry into whether Title IX and its resulting interpretations are "benign" or "remedial," and conscious of the fact that labels can be used to hide illegitimate notions of inferiority or simple politics just as easily in the context of gender as in the context of race, we should now follow *Adarand*'s lead and subject all gender-conscious government action to the same inquiry.[25]

### B. *United States v. Virginia*

A second Supreme Court case has also made it necessary to review our decision in *Cohen II.* In *United States v. Virginia,* —— U.S. ——, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996), the Court faced an Equal Protection challenge to Virginia's practice of maintaining the Virginia Military Institute as an all male institution. Rather than simply apply the traditional test requiring that gender classifications be "substantially related to an important government objective," *Clark v. Jeter* 486 U.S. 456, 461, 108 S.Ct. 1910, 1914, 100 L.Ed.2d 465 (1988), the Supreme Court applied a more searching "skeptical scrutiny of official action denying rights or opportunities based on sex," *id.,* at ——, 116 S.Ct. at 2274, which requires that "[p]arties who seek to defend gender-based government action must demonstrate an 'exceedingly persuasive justification' for that action," *id.* In its discussion, the Court stated that, in order to prevail in a gender case, "the State must show *at least* that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Id.* at ——, 116 S.Ct. at 2275 (internal quotations omitted) (emphasis added). Being "substantially related to an important government objective," therefore, is considered a necessary but not sufficient condition. The Court also requires a focus on "whether the proffered justification is 'exceedingly persuasive.'" *Id.*

**25.** Our discussion in *Cohen II* also cited *Califano v. Webster,* 430 U.S. 313, 97 S.Ct. 1192, 51 L.Ed.2d 360 (1977), which has not been explicitly overruled. That case concerned Congress' provision, under the Social Security Act, for a lower retirement age for women than for men, with the result that, as between similarly situated male and female wage-earners, the female wage-earner would be awarded higher monthly social security payments, *id.* at 314–16, 97 S.Ct. at 1193–94. In that case, Congress specifically found that more frequent and lower age limits were being applied to women than to men in the labor market. *Id.* at 319, 97 S.Ct. at 1195–96. This led the Supreme Court to characterize the provision at issue as remedial rather than benign, noting that the provision had been repealed in 1972, roughly contemporaneously with "congressional [anti-discrimination] reforms [that] ... have lessened the economic justification for the more favorable benefit computation" for women. *Id.* at 320, 97 S.Ct. at 1196. The instant case should be distinguished from *Califano* for two reasons. First, *Califano* did not necessarily rule on benign classifications, as *Metro Broadcasting* and *Adarand* clearly did. Second, *Califano,* unlike the instant case, contained an "exceedingly persuasive justification" for its gender-conscious state action.

*Virginia* "drastically revise[d] our established standards for reviewing sex-based classifications." *Id.* at ——, 116 S.Ct. at 2291 (Scalia, J. dissenting). "Although the Court in two places ... asks whether the State has demonstrated that the classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives ... the Court never answers the question presented in anything resembling that form." *Id.* at ——, 116 S.Ct. at 2294 (citations omitted). "[T]he Court proceeds to interpret 'exceedingly persuasive justification' in a fashion that contradicts the reasoning of *Hogan* and our other precedents." *Id.*

What is important for our purposes is that the Supreme Court appears to have elevated the test applicable to sex discrimination cases to require an "exceedingly persuasive justification." This is evident from the language of both the majority opinion and the dissent in *Virginia.*

This is not just a matter of semantics. *Metro Broadcasting,* and our application of its intermediate scrutiny standard in *Cohen II,* omitted the additional "skeptical scrutiny" requirement of an "exceedingly persuasive justification" for gender-based government action. *Compare Virginia,* —— U.S. at ——, 116 S.Ct. at 2274 (citing *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 136–37, and n. 6, 114 S.Ct. 1419, —— – —— and n. 6, 128 L.Ed.2d 89 (1994)), and *Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982), *with Metro Broadcasting,* 497 U.S. at 564–65, 110 S.Ct. at 3008–09.

I conclude, therefore, that *Adarand* and *Virginia* are irreconcilable with the analysis in *Cohen II* and, accordingly, we must follow the guidance of the Supreme Court in this appeal. Under the new standards established in those cases, *Cohen II* is flawed both because it applies a lenient version of intermediate scrutiny that is impermissible following *Adarand* and because it did not apply the "exceedingly persuasive justification" test of *Virginia.* We must, as Brown urges, reexamine the Equal Protection challenge to the three-prong test as interpreted by the district court.

## C. Preliminary Injunction

In addition to the above reasons for considering the merits of this appeal, it is important to note that *Cohen II* was an appeal from a preliminary injunction. "When an appeal comes to us in that posture, the appellate court's conclusions as to the merits of the issues presented on preliminary injunction are to be understood as statements of probable outcomes, rather than as comprising the ultimate law of the case." *A.M. Capen's Co. v. American Trading and Prod. Co.,* 74 F.3d 317, 322 (1st Cir.1996) (internal quotations omitted); *see also Narragansett Indian Tribe v. Guilbert,* 934 F.2d 4, 6 (1st Cir.1991).

The binding authority of *Cohen II,* therefore, is lessened by the fact that it was an appeal from a preliminary injunction. First, we now have a full record before us and a set of well-defined legal questions presented by the appellant. Trial on the merits has served to focus these questions and to provide background that allows us to consider these questions in the proper context and in detail. In its decision in *Cohen II,* this court recognized and, indeed, emphasized the fact that its holding was only preliminary. *Cohen II,* 991 F.2d at 902 ("a party losing the battle on likelihood of success may nonetheless win the war at a succeeding trial"). Rather than turning that ruling into a permanent one, we should review the question in light of the full set of facts now available.

Second, the standard of review has changed. The *Cohen II* court stated that it was adopting a deferential standard of review, and that "if ... the district court made no clear error of law or fact, we will overturn its calibration ... only for manifest abuse of discretion." *Id.* at 902. The test applied by the court was based on "(1) the movant's probability of victory on the merits; (2) the potential for irreparable harm if the injunction is refused; (3) the balance of interests as between the parties ... and (4) the public interest." *Id.* The case is now before us on appeal from the merits and we must review it accordingly. For the purposes of this ap-

peal, we must review findings of fact under a clearly erroneous standard, *Reich v. Newspapers of New England, Inc.*, 44 F.3d 1060, 1069 (1st Cir.1995) and findings of law *de novo*, *Portsmouth v. Schlesinger*, 57 F.3d 12, 14 (1st Cir.1995). Because the standard has changed, it is conceivable that the result of the analysis will change, making review appropriate.

## II. BROWN'S EQUAL PROTECTION CHALLENGE

Appellees have argued that the three-prong test does not create a gender classification because the classification applies to both women and men. Although I agree that by its words, the test would apply to men at institutions where they are proportionately underrepresented in intercollegiate athletics, I cannot accept the argument that, via this provision, the Government does not classify its citizens by gender. *See United States v. Virginia*, — U.S. —, — — —, 116 S.Ct. 2264, 2274–76, 135 L.Ed.2d 735 (1996) (applying Equal Protection review to "gender-based government action" where Commonwealth of Virginia attempted to maintain two purportedly equal single-sex institutions). *Cf. Loving v. Virginia*, 388 U.S. 1, 8–9, 87 S.Ct. 1817, 1821–22, 18 L.Ed.2d 1010 (1967) (stating that even though the statute at issue applied equally to members of different racial classifications, it still implicated race-related Equal Protection concerns, since the statute itself contained race-conscious classifications). The fact of gender-conscious classification, even with equal enforcement with respect to both genders, requires the application of a higher level of scrutiny than rational basis review. We cannot pretend that an interpretation of a statute that contains explicit categorization according to gender and that has intentional gender-conscious effect does not represent gender-based government action. Equal Protection is implicated where the claim is made that a classification made by the government intentionally subjects an individual to treatment different from similarly situated individuals based on an impermissible characteristic, such as race, national origin, or gender. Ronald D. Rotunda & John E. Nowak, 3 *Treatise on Constitutional Law* § 18.2, at 7–8 (2d ed. 1992).

### A. The District Court's Construction of the Three–Prong Test

#### 1. Prong One

A central issue in this case is the manner in which athletic "participation opportunities" are counted. During the 1990–91 academic year, Brown fielded 16 men's and 15 women's varsity teams on which 566 men and 328 women participated. By the 1993–94 year, there were 12 university-funded men's teams and 13 university funded women's teams. These teams included 479 men and 312 women. Based on an analysis of membership in varsity teams, the district court concluded that there existed a disparity between female participation in intercollegiate athletics and female student enrollment.

Even assuming that membership numbers in varsity sports is a reasonable proxy for participation opportunities—a view with which I do not concur—contact sports should be eliminated from the calculus. The regulation at 34 C.F.R. § 106.41(b)(1995) provides that an academic institution may operate separate teams for members of each sex "where selection of such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(b). When a team is sponsored only for one sex, however, and where "athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered *unless the sport involved is a contact sport,*" *id.* (emphasis added). The regulation, therefore, allows schools to operate single-sex teams in contact sports. In counting participation opportunities, therefore, it does not make sense to include in the calculus athletes participating in contact sports that include only men's teams. For example, if a university chooses to sponsor a football team, it is permitted to sponsor only a men's team. Not all sports are the same and the university should be given the flexibility to determine which activities are most beneficial to its student body. By including in its accounting a contact sport that requires very large numbers of participants, e.g., football, the district court skews the number of athletic partici-

pants—making it impossible for the university to provide both men's and women's teams in other sports.

If the athletes competing in sports for which the university is permitted to field single-sex teams are excluded from the calculation of participation rates, the proportion of women participants would increase dramatically and prong one might be satisfied. If so, the inquiry ends and Brown should be judged to be in compliance.

## 2. Prong Two

The district court concluded, and the majority appears to agree, that Brown failed to satisfy prong two because "merely reducing program offerings to the overrepresented gender does not constitute program expansion for the underrepresented gender." Majority Opinion at 166. This is a curious result because the entire three-prong test is based on *relative* participation rates. Prong one, for example, requires that participation opportunities be provided proportionately to enrollment, but does not mandate any absolute number of such opportunities. The district court's conclusion with respect to prong two, however, implies that a school must not only demonstrate that the proportion of women in their program is growing over time, it must also show that the *absolute* number of women participating is increasing.[26]

Under the district court's interpretation, a school facing budgetary constraints must, in order to comply with prong two, *increase* the opportunities available to the underrepresented gender, even if it cannot afford to do so. Rather than respecting the school's right to determine the role athletics will play in the future—including reducing the opportunities available to the formerly overrepresented gender to ensure proportionate opportunities—the district court and the majority demand that the *absolute* number of opportunities provided to the underrepresented gender be increased. I see no possible justification for this interpretation—the regulation is

intended to protect against discrimination, not to promote athletics on college campuses. A school is not required to sponsor an athletic program of any particular size. It is not for the courts, or the legislature, for that matter, to mandate programs of a given size. The most that can be demanded is that athletics be provided in a non-discriminatory manner.

Furthermore, the claim that a reduction in the opportunities given to the overrepresented gender is an unacceptable method of coming into compliance with the three prong test is contrary to both *Cohen II* and comments of the majority opinion. The majority quotes approvingly from *Cohen v. Brown Univ.*, 879 F.Supp. 185 (D.R.I.1995) (*Cohen III*), to demonstrate the many ways in which a university might achieve compliance:

> It may eliminate its athletic program altogether, it may elevate or create the requisite number of women's positions, it may demote or eliminate the requisite number of men's positions, or it may implement a combination of these remedies.

Majority Opinion at 185 (quoting *Cohen III*). This conclusion is consistent with *Cohen II*, which states that a school may achieve compliance by reducing opportunities for the overrepresented gender. *See Cohen II*, 991 F.2d at 898 n. 15. I fail to see how these statements can be reconciled with the claim that Brown cannot satisfy prong two by reducing the number of participation opportunities for men.

## 3. Prong Three

Prong three of the three-prong test states that, where an institution does not comply with prongs one or two, compliance will be assessed on the basis of

> whether it can be demonstrated that the interests and abilities of the members of th[e] [proportionately underrepresented] sex have been fully and effectively accommodated by the present program.

44 Fed.Reg. 71,413, 71,418 (December 11, 1979).

---

**26.** This requirement presents a dilemma for a school in which women are *less interested* in athletics, as Brown contends is the case. Under such conditions, a school may be unable to succeed under the second prong because there may not be enough interested female students to achieve a continuing increase in the number of female participants.

According to the district court, Brown's athletics program violates prong three because members of the proportionately underrepresented sex have demonstrated interest sufficient for a university-funded varsity team that is not in fact being funded. The district court asserts that this is not a quota. Brown, on the other hand, argues that prong three is satisfied when (1) the interests and abilities of members of the proportionately underrepresented gender (2) are accommodated to the same degree as the proportionately overrepresented gender.

The district court's narrow, literal interpretation should be rejected because prong three cannot be read in isolation. First, as Brown points out, the Regulation that includes prong three provides that, in assessing compliance under the regulation, "the governing principle in this area is that the *athletic interests and abilities of male and female students be equally effectively accommodated.*" *Policy Interpretation*, 44 Fed. Reg. 71,413, 71,414. Thus, Brown contends, to meet "fully"—in an absolute sense—the interests and abilities of an underrepresented gender, while unmet interest among the overrepresented gender continues, would contravene the governing principle of "equally effective accommodat[ion]" of the interests and abilities of students of both genders.

It is also worthwhile to note that to "fully" accommodate the interests and abilities of the underrepresented sex is an extraordinarily high—perhaps impossibly so—requirement. How could an academic institution with a large and diverse student body ever "fully" accommodate the athletic interests of its students? Under even the largest athletic program, it would be surprising to find that there is not a single student who would prefer to participate in athletics but does not do so because the school does not offer a program in the particular sport that interests the student. To read fully in an absolute sense would make the third prong virtually impossible to satisfy and, therefore, an irrelevant addition to the test.

This difficulty was recognized in *Cohen II*, which stated that "the mere fact that there are some female students interested in a sport does not *ipso facto* require the school to provide a varsity team in order to comply with the third benchmark." *Cohen II* 991 F.2d at 898. The balance that *Cohen II* advocates would require the institution to ensure "participatory opportunities ... when, and to the extent that, there is sufficient interest and ability among the members of the excluded sex to sustain a viable team." *Id.* (internal citations omitted). This standard may be practical for certain sports that require large teams, but what of individual sports? A "viable" tennis team may require only a single player. The same could be said of any individual sport, including golf, track and field, cycling, fencing, archery, and so on. Therefore, we still have the problem that to "fully accommodate" the interests of the underrepresented sex may be impossible under the district court's interpretation.

In light of the above, Brown argues that prong three is in fact ambiguous with respect to whether "fully" means (1) an institution must meet 100% of the underrepresented gender's unmet reasonable interest and ability, or (2) an institution must meet the underrepresented gender's unmet reasonable interest and ability as fully as it meets those of the overrepresented gender. I agree with Brown that, in the context of OCR's Policy Interpretation, prong three is susceptible to at least these two plausible interpretations.

Additionally, section 1681(a), a provision enacted by Congress as part of Title IX itself, casts doubt on the district court's reading of prong three. 20 U.S.C. § 1681(a) (1988). As Brown points out, Title IX, of which the Policy Interpretation is an administrative interpretation, contains language that prohibits the ordering of preferential treatment on the basis of gender due to a failure of a program to substantially mirror the gender ratio of an institution. Specifically, with respect to Title IX's guarantee that no person shall be excluded on the basis of sex from "participation in, be denied the benefits of or be subjected to discrimination under any education program or activity receiving Federal financial assistance," 20 U.S.C. § 1681(a),

> [n]othing contained [therein] shall be interpreted to require any educational institution to grant preferential or disparate

treatment to the members of one sex on account of an imbalance which may exist with respect to the total number or percentage of persons of the sex participating in or receiving the benefits of any federally supported program or activity, in comparison with the total number or percentage of persons of that sex in any community. *Id.* § 1681(b). Section 1681(b) provides yet another reason why the district court's reading of prong three is troublesome and why Brown's reading is a reasonable alternative.

Since the applicable regulation, 34 C.F.R. § 106.41, and policy interpretation, 44 Fed. Reg. 71,418, are not manifestly contrary to the objectives of Title IX, and Congress has specifically delegated to an agency the responsibility to articulate standards governing a particular area, we must accord the ensuing regulation considerable deference. *Chevron, U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984). That notwithstanding, where—as here—the resulting regulation is susceptible to more than one reasonable interpretation, we owe no such deference to the interpretation chosen where the choice is made not by the agency but by the district court. Therefore, like other cases of statutory interpretation, we should review the district court's reading *de novo.*

## B. The District Court's Interpretation and the Resulting Equal Protection Problem

The district court's interpretation of prongs one and three creates an Equal Protection problem, which I analyze in two steps. First, the district court's interpretation creates a quota scheme. Second, even assuming such a quota scheme is otherwise constitutional, appellees have not pointed to an "exceedingly persuasive justification," *see Virginia*, —— U.S. at ——, 116 S.Ct. at 2274, for this particular quota scheme.

### 1. The Quota

I believe that the three prong test, as the district court interprets it, is a quota. I am in square disagreement with the majority, who believe that "[n]o aspect of the Title IX regime at issue in this case ... mandates gender-based preferences or quotas." Majority Opinion at 170. Put another way, I agree that "Title IX is not an affirmative action statute," *id.*, but I believe that is exactly what the district court has made of it. As interpreted by the district court, the test constitutes an affirmative action, quota-based scheme.

I am less interested in the actual term "quota" than the legally cognizable characteristics that render a quota scheme impermissible. And those characteristics are present here in spades. I am not persuaded by the majority's argument that the three-part test does not constitute a quota because it does not permit an agency or court to find a violation solely on the basis of prong one of the test; instead, an institution must also fail prongs two and three. As Brown rightly argues, the district court's application of the three-prong test requires Brown to allocate its athletic resources to meet the as-yet-unmet interest of a member of the underrepresented sex, women in this case, while simultaneously neglecting any unmet interest among individuals of the overrepresented sex. To the extent that the rate of interest in athletics diverges between men and women at any institution, the district court's interpretation would require that such an institution treat an individual male student's athletic interest and an individual female student's athletic interest completely differently: one student's reasonable interest would have to be met, *by law*, while meeting the other student's interest would only aggravate the lack of proportionality giving rise to the legal duty. "The injury in cases of this kind is that a 'discriminatory classification prevent[s] ... competition on an equal footing.'" *Adarand*, —— U.S. at ——, 115 S.Ct. at 2104 (quoting *Northeastern Fla. Chapter, Assoc'd Gen'l Contractors of America v. Jacksonville*, 508 U.S. 656, 666, 113 S.Ct. 2297, 2303, 124 L.Ed.2d 586 (1993)). As a result, individual male and female students would be precluded from competing against each other for scarce resources; they would instead compete only against members of their own gender. *Cf. Hopwood v. Texas*, 78 F.3d 932, 943–46 (5th

Cir.) (concluding that not only would government action precluding competition between individuals of different races for law school admissions be unconstitutional, but in fact even partial consideration of race among other factors would be unconstitutional), *cert. denied*, —— U.S. ——, 116 S.Ct. 2581, 135 L.Ed.2d 1095 (1996).[27]

The majority claims that "neither the Policy Interpretation nor the district court's interpretation of it, *mandates* statistical balancing." Majority Opinion at 175. The logic of this position escapes me. A school can satisfy the test in three ways. The first prong is met if the school provides participation opportunities for male and female students in numbers substantially proportionate to their enrollments. This prong surely requires statistical balancing. The second prong is satisfied if an institution that cannot meet prong one can show a "continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of the underrepresented sex." 44 Fed.Reg. at 71,-418. It can hardly be denied that this prong requires statistical balancing as it is essentially a test that requires the school to show that it is moving in the direction of satisfying the first prong. Establishing that a school is moving inexorably closer to satisfying a requirement that demands statistical balancing can only be done by demonstrating an improvement in the statistical balance. In other words, the second prong also requires balancing. Finally, the third prong, interpreted as the majority advocates, dispenses with statistical balancing only because it choose to accord zero weight to one side of the balance. Even a single person with a reasonable unmet interest defeats compliance. This standard, in fact, goes farther than the straightforward quota test of prong one. According to the district court, the unmet interests of the underrepresented sex must be *completely* accommodated before *any* of the interest of the overrepresented gender can be accommodated.[28]

A pragmatic overview of the effect of the three-prong test leads me to reject the majority's claim that the three-prong test does not amount to a quota because it involves multiple prongs. In my view it is the result of the test, and not the number of steps involved, that should determine if a quota system exists. Regardless of how many steps are involved, the fact remains that the test requires proportionate participation opportunities for both sexes (prong one) unless one sex is simply not interested in participating (prong three). It seems to me that a quota with an exception for situations in which there are insufficient interested students to allow the school to meet it remains a quota. All of the negative effects of a quota remain,[29] and the school can escape the quota

**27.** In response, appellees cite *Kelley v. Board of Trustees*, 35 F.3d 265 271 (1994), for the proposition that the three-prong test does not constitute a quota, because it does not "require any educational institution to grant preferential or disparate treatment" to the gender underrepresented in that institution's athletic program. *Id.* However, in *Kelley*, the Seventh Circuit, unlike the district court, did not use the three-prong test as a definitive test for liability. Rather, the Seventh Circuit endorsed the test as one for compliance, in *dismissing the plaintiff's* claims. The Seventh Circuit did not consider the question of whether, had the defendant University of Illinois *not* been in compliance, lack of compliance with the three-prong test *alone* would trigger automatic liability, nor did the Seventh Circuit spell out what steps would have been required of defendant. At any rate, *Kelley* pre-dates the Supreme Court's opinions in *Adarand* and *Virginia*, meaning that it suffers from the same defects as *Cohen II*.

**28.** The problem with the majority's argument can be illustrated with a hypothetical college admissions policy that would require proportionality between the gender ratio of the local student aged population and that of admitted students. This policy is comparable to prong one of the three prong test and is, without a doubt, a quota. It is no less a quota if an exception exists for schools whose gender ratio differs from that of the local population but which admit every applicant of the underrepresented gender. It remains a quota because the school is forced to admit every female applicant until it reaches the requisite proportion. Similarly, the district court's interpretation requires the school to accommodate the interests of every female student until proportionality is reached.

**29.** Nor does the second prong of the test change the analysis. That prong merely recognizes that a school may not be able to meet the quotas of the first or third prong immediately, and therefore deems it sufficient to show program expansion that is responsive to the interests of the underrepresented sex.

under prong three only by offering preferential treatment to the group that has demonstrated less interest in athletics.

### 2. "Extremely Persuasive Justification" Test

In view of the quota scheme adopted by the district court, and Congress' specific disavowal of any intent to require quotas as part of Title IX, appellees have not met their burden of showing an "exceedingly persuasive justification" for this gender-conscious exercise of government authority. As recently set forth in *Virginia*, "[p]arties who seek to defend gender-based government action must demonstrate an 'exceedingly persuasive justification' for that action." *Virginia*, —— U.S. at ——, 116 S.Ct. at 2274. While the Supreme Court in *Virginia* acknowledged that "[p]hysical differences between men and women ... are enduring," *id.* at ——, 116 S.Ct. at 2276, it went on to state that such " '[i]nherent differences' between men and women, we have come to appreciate, remain cause for celebration, but not for ... artificial constraints on an individual's opportunity." *Id.*

Neither appellees nor the district court have demonstrated an "exceedingly persuasive justification" for the government action that the district court has directed in this case. In fact, appellees have failed to point to *any* congressional statement or indication of intent regarding a proportional representation scheme as applied by the district court. While they point to Congress' decision to delegate authority to the relevant agencies, this does not amount to a genuine—that is, not hypothesized or invented in view of litigation, *id.* at ——, 116 S.Ct. at 2275—exceedingly persuasive justification in light of section 1681(b)'s "no quota" provision. We are left with the explanations discussed in *Cohen II* to the effect that Congress conducted hearings on the subject of discrimination against women in education. There is little more than that, because Congress adopted Title IX as a floor amendment without committee hearings or reports. *See Cohen II*, 991 F.2d at 893.

I believe that the district court's interpretation of the Policy Interpretation's three-prong test poses serious constitutional difficulties. "[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, [we] construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988); *see NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 507, 99 S.Ct. 1313, 1322, 59 L.Ed.2d 533 (1979). To the extent that Congress expressed a specific intent germane to the district court's interpretation, Congress, if anything, expressed an aversion to quotas as a method to enforce Title IX. As a result, I opt for Brown's construction of prong three, which, as we have discussed, *infra*, is also a reasonable reading.

Accordingly, I would reverse and remand for further proceedings.

### III. EVIDENTIARY ISSUES

In disputes over the representation of women in athletic programs, it is inevitable that statistical evidence will be relevant. There is simply no other way to assess participation rates, interest levels, and abilities. The majority opinion, however, offers inconsistent guidance with respect to the role of statistics in Title IX claims. Early in the opinion, the majority approvingly cites to the statistical evaluations conducted in *Cohen I*, *Cohen II*, and *Cohen III*. Majority Opinion at 163. The figures in question demonstrate that women's participation in athletics is less than proportional to their enrollment. Later in the opinion, however, when the level of interest among women at Brown is at issue, the court adopts a much more critical attitude towards statistical evidence: "[T]here exists the danger that, rather than providing a true measure of women's interest in sports, statistical evidence purporting to reflect women's interest instead provides only a measure of the very discrimination that is and has been the basis for women's lack of opportunity." Majority Opinion at 179. In other words, evidence of differential levels of interest is not to be credited because it may

simply reflect the result of past discrimination.

The refusal to accept surveys of interest levels as evidence of interest raises the question of what indicators might be used. The majority offers no guidance to a school seeking to assess the levels of interest of its students. Although the three-prong test, even as interpreted by the district court, appears to allow the school the opportunity to show a lack of interest, the majority rejects the best—and perhaps the only—mechanism for making such a showing.

Brown claims that the district court erred in excluding evidence pertaining to the relative athletic interests of men and women at the university. Brown sought to introduce the NCAA Gender Equity Study and the results of an undergraduate poll on student interest in athletics, but was not permitted to do so. The majority is unsympathetic to Brown's claim that the disparity between athletic opportunities for men and women reflect a gender-based difference in interest levels. Indeed, despite Brown's attempt to present evidence in support of its claim, the majority characterizes Brown's argument as an "unproven assertion." Majority Opinion at 178.[30]

Furthermore, the majority recognizes that institutions are entitled to use any nondiscriminatory method of their choosing to determine athletic interests. Majority Opinion at 179 n. 15. If statistical evidence of interest levels is not to be considered by courts, however, there is no way for schools to determine whether they are in compliance. Any studies or surveys they might conduct in order to assess their own compliance would, in the event of litigation, be deemed irrelevant. Regardless of the efforts made by the

academic institution, the specter of a lawsuit would be ever-present.

In addition, the majority has put the power to control athletics and the provision of athletic resources in the hands of the underrepresented gender. Virtually every other aspect of college life is entrusted to the institution, but athletics has now been carved out as an exception and the university is no longer in full control of its program. Unless the two genders participate equally in athletics, members of the underrepresented sex would have the ability to demand a varsity level team at any time if they can show sufficient interest. Apparently no weight is given to the sustainability of the interest, the cost of the sport, the university's view on the desirability of the sport, and so on.

## IV. FIRST AMENDMENT ISSUE

Finally, it is important to remember that Brown University is a private institution with a constitutionally protected First Amendment right to choose its curriculum. Athletics are part of that curriculum. Although the protections of the First Amendment cannot be used to justify discrimination, this court should not forget that it has a duty to protect a private institution's right to mould its own educational environment.

The majority pays lip service to these concerns in the final pages of its long opinion, stating that " 'we are a society that cherishes academic freedom and recognizes that universities deserve great leeway in their operations.' " Majority Opinion at 185 (quoting *Cohen II*, 991 F.2d at 906), and "[o]ur respect for academic freedom and reluctance to interject ourselves into the conduct of university affairs counsels that we give universities as much freedom as possible." Majority Opinion at 185. Despite these statements,

---

**30.** Among the evidence submitted by Brown are: (i) admissions data showing greater athletic interest among male applicants than female applicants; (ii) college board data showing greater athletic interest and prior participation rates by prospective male applicants than female applicants; (iii) data from the Cooperative Institutional Research Program at UCLA indicating greater athletic interest among men than women; (iv) an independent telephone survey of 500 randomly selected Brown undergraduates that reveals that Brown offers women participation opportunities in excess of their representation in the pool of interested, qualified students; (v) intramural and club participation rates that demonstrate higher participation rates among men than women; (vi) walk-on and try-out numbers that reflect a greater interest among men than women; (vii) high school participation rates that show a much lower rate of participation among females than among males; (viii) the NCAA Gender Equity Committee data showing that women across the country participate in athletics at a lower rate than men.

however, the majority in its opinion today, and the district court before it, have failed to give Brown University freedom to craft its own athletic program and to choose the priorities of that program. Instead, they have established a legal rule that straight-jackets college athletics programs by curtailing their freedom to choose the sports they offer.